07-4244-cv
Wilson v. CIA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: January 8, 2009                    Decided: November 12, 2009)

Docket No. 07-4244-cv

VALERIE PLAME WILSON, SIMON & SCHUSTER INC.,

*Plaintiffs-Appellants*,

—v.—

THE CENTRAL INTELLIGENCE AGENCY; LEON E. PANETTA, in his official capacity as Director of the Central Intelligence Agency; and DENNIS C. BLAIR, in his official capacity as Director of National Intelligence,[*]

*Defendants-Appellees*.

Before:

KATZMANN and RAGGI, *Circuit Judges*, and KEENAN, *District Judge*.[**]

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Leon E. Panetta, the present Director of the Central Intelligence Agency, and Dennis C. Blair, the present Director of National Intelligence, are automatically substituted as defendants herein for their respective predecessors, Michael V. Hayden and J. Michael McConnell. The Clerk of Court is directed to amend the caption to read as shown above.

[**] The Honorable John F. Keenan of the United States District Court for the Southern District of New York, sitting by designation.

1

_____

Appeal from an award of summary judgment in favor of defendants entered in the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*). Plaintiffs Valerie Plame Wilson, a former employee of the Central Intelligence Agency, and Simon & Schuster Inc., the publisher of her memoir, submit that the district court erred in concluding, as a matter of law, that the CIA did not violate the First Amendment when it refused to allow Ms. Wilson to publish information regarding her possible pre-2002 service with the Agency. Plaintiffs assert that they have a right to publish such information because (1) the CIA "officially disclosed" Ms. Wilson's pre-2002 dates of service; and (2) those dates are, in any event, now in the public domain. The record cannot support plaintiffs' official disclosure assertion as it was Ms. Wilson, and not the Agency, that permitted the information at issue to be revealed to the public. Further, plaintiffs' public-domain argument fails because public disclosure does not deprive information of classified status, and the Agency has demonstrated good reason for adhering to its classification decision. Accordingly, because any information concerning Ms. Wilson's possible pre-2002 Agency affiliation remains properly classified, and because Ms. Wilson is obligated by a secrecy agreement with the CIA not to disclose classified information, the district court correctly ruled that plaintiffs cannot demonstrate a First Amendment violation in this case.

AFFIRMED.

Judge Katzmann concurs in the judgment of the Court and files a separate concurring opinion.

———————

DAVID B. SMALLMAN, Smallman & Hans LLP, New York, New York, *for Plaintiffs-Appellants*.

BENJAMIN H. TORRANCE, Assistant United States Attorney (Beth E. Goldman, Assistant United States Attorney, *on the brief*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for Defendants-Appellees*.

R. Bruce Rich and Jonathan Bloom, Weil, Gotshal & Manges LLP, New York, New York, *for Amici Curiae* Association of American Publishers, Inc., American Booksellers Foundation for Free Expression, American Society of Newspaper Editors, Association of Alternative Newsweeklies, Association of American University Presses, Freedom to Read Foundation, Magazine Publishers Association, Public Citizen, Inc., Publishers Marketing Association, Radio-Television News Directors Association, Reporters Committee for Freedom of the Press, and Society of Professional Journalists, *in support of Plaintiffs-Appellants*.

———————

REENA RAGGI, *Circuit Judge*:

Plaintiffs Valerie Plame Wilson, a former employee of the Central Intelligence Agency ("CIA" or the "Agency"), and Simon & Schuster Inc., the publisher of her memoir, Fair Game: My Life as a Spy, My Betrayal by the White House (2007) ("Fair Game"), sued the CIA, the CIA Director, and the Director of National Intelligence in the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*) under the

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Administrative Procedure Act, 5 U.S.C. § 701 et seq., for alleged violations of the First Amendment. To vindicate their asserted constitutional rights, plaintiffs sought an order precluding defendants from enforcing a decision by the CIA's Publication Review Board forbidding publication of any passages in Ms. Wilson's memoir relating to her possible pre-2002 service with the Agency.[1] On cross-motions for summary judgment, the district court concluded that plaintiffs could not demonstrate a First Amendment violation and entered judgment in favor of defendants. See Wilson v. McConnell, 501 F. Supp. 2d 545 (S.D.N.Y. 2007).

Plaintiffs appeal, arguing that the district court erred when it determined, as a matter of law, that because any facts relating to Ms. Wilson's possible pre-2002 service with the CIA remained properly classified, the Agency could, consistent with the First Amendment, forbid her from disclosing such information under the terms of a secrecy agreement that was a condition of her Agency employment. Plaintiffs assert that two reasons mandate a different conclusion: (1) the CIA itself "officially disclosed" the dates of Ms. Wilson's pre-2002 Agency service in a letter sent to her on February 10, 2006; and (2) Ms. Wilson's pre-2002 dates of service are, in any event, now a matter of such widespread public knowledge as to render unreasonable the Agency's insistence on maintaining the information as classified.

---

[1] All references in this opinion to Ms. Wilson's possible pre-2002 Agency affiliation are hypothetical and should not be understood to confirm or deny any information on that subject.

4

The record does not support plaintiffs' official disclosure claim as it was Ms. Wilson, and not the Agency, that permitted the information at issue to be revealed to the public. Although the CIA may have been negligent in communicating personnel information to Ms. Wilson without proper classification, the information only became public when Ms. Wilson – knowing that the CIA was insisting on maintaining the secrecy of her service dates – nevertheless authorized a member of Congress to publish the CIA communication in the Congressional Record. See infra at **[29-37]**.

We also conclude that evidence of public disclosure does not deprive information of classified status and that the Agency has demonstrated a reasonable basis for maintaining information about Ms. Wilson's pre-2002 Agency service as classified. Accordingly, because the information at issue on this appeal remains properly classified, and because Ms. Wilson is obligated by the conditions of her employment with the CIA not to disclose classified information, plaintiffs' First Amendment claim fails as a matter of law. We therefore affirm the award of summary judgment entered in favor of defendants.[2]

---

[2] Our concurring colleague, Judge Katzmann, agrees with us "that Ms. Wilson's pre-2002 dates of service, if any, were originally properly classified by the CIA, have never been officially declassified, and were never officially disclosed by the CIA." Post at **[1]**. He "also agree[s] that this Court has no power to free Ms. Wilson from the secrecy agreement that she signed upon commencement of her employment with the CIA." Id. Nevertheless, he faults the CIA's "litigation posture" in this case for "blink[ing the] reality . . . of the unique facts of this case and the policies behind the doctrines at issue here." Id.

Our skepticism about the wisdom of a party's litigation strategy cannot, of course, prompt any different decision than that required by law. In any event, as we explain in this opinion, the factual background to this case hardly casts plaintiffs' argument in a favorable

## I. Factual Background

This is no routine employer-employee dispute. Rather, it involves highly publicized actions by all three branches of the federal government. Although we here review only those facts necessary to our resolution of the issues raised on this appeal, that discussion is necessarily lengthy.

### A. The Initial Public Disclosure of Valerie Wilson's CIA Employment

During his 2003 State of the Union address, President George W. Bush told Congress that "[t]he British Government has learned that [Iraq's dictator] Saddam Hussein recently sought significant quantities of uranium from Africa." Address Before a Joint Session of Congress on the State of the Union, 1 PUB. PAPERS 82, 88 (Jan. 28, 2003). A public debate ensued regarding the accuracy of this assertion. See generally Wilson v. Libby, 535 F.3d 697, 701-02 (D.C. Cir. 2008) (describing debate), cert. denied 77 U.S.L.W. 3506 (June 22, 2009); In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1143 (D.C. Cir. 2006)

---

light. While the CIA's negligence appears to have caused classified information about Ms. Wilson's service dates to be disclosed outside the Agency, that disclosure was only to Ms. Wilson, a person authorized to receive it. It was Ms. Wilson herself who proceeded, without authorization, to approve public disclosure of the classified information. For the reasons stated herein, we hold that a former CIA agent cannot use her own unauthorized disclosure of classified information to challenge the Agency's ability to maintain the information as classified. See infra at **[44]**. Further, though Ms. Wilson's unauthorized action may have reduced the policy reasons for maintaining the challenged classification of her service dates, the Agency's classified submission demonstrates that, in the context of Ms. Wilson's memoir, sufficient reasons for continued classification persist to preclude a judicial reversal of Agency judgment. See infra at **[46-47]**.

(same). On July 6, 2003, The New York Times published an op-ed piece written by plaintiff Valerie Plame Wilson's husband, Joseph C. Wilson IV, a former foreign service officer who had represented the United States in various capacities, including deputy chief of mission at the U.S. Embassy in Iraq from 1988 to 1991 and U.S. ambassador to Gabon from 1992 to 1995. See JOSEPH WILSON, THE POLITICS OF TRUTH: INSIDE THE LIES THAT PUT THE WHITE HOUSE ON TRIAL AND BETRAYED MY WIFE'S CIA IDENTITY 518 (2004). In his op-ed piece, Mr. Wilson disclosed that, in 2002, the CIA had sent him to Africa to assess the accuracy of intelligence indicating that Niger had sold uranium yellowcake to Iraq in the late 1990s. See Joseph C. Wilson IV, What I Didn't Find in Africa, N.Y. TIMES, July 6, 2003, § 4, at 9. Mr. Wilson stated that, based on his investigation, he determined that "it was highly doubtful that any such transaction had ever taken place," and that he had so informed the CIA in March 2002, nine months before President Bush's 2003 State of the Union address. Id. Mr. Wilson suggested that if the Bush Administration ignored his report "because it did not fit certain preconceptions about Iraq, then a legitimate argument can be made that we went to war under false pretenses." Id.

Eight days later, syndicated columnist Robert Novak commented on Mr. Wilson's op-ed piece and, in doing so, revealed Ms. Wilson's employment with the CIA: "[Joseph] Wilson never worked for the CIA, but his wife, Valerie Plame, is an agency operative on weapons of mass destruction. Two senior administration officials told me that Wilson's wife suggested sending him to Niger to investigate" the intelligence regarding Iraq's attempted

uranium purchases.  Robert D. Novak, Mission to Niger, WASH. POST, July 14, 2003, at A21.[3]

B.     The CIA's Official Acknowledgment of Ms. Wilson's Post-2002 Service with the Agency

At the time of the Novak disclosure, Ms. Wilson was in fact a "covert CIA employee for whom the CIA was taking affirmative measures to conceal her intelligence relationship to the United States."  Unclassified Summary of Valerie Wilson's CIA Employment & Cover History at 1, United States v. Libby, Cr. No. 05-394 (D.D.C. May 25, 2007).  As plaintiffs acknowledge, Ms. Wilson's "employment affiliation with the CIA" was then "highly classified."  Appellants' Br. at 6.

The revelation of Ms. Wilson's CIA employment caused a public outcry, leading to the appointment of a special prosecutor to investigate whether any government employees had violated federal law by disclosing the identity of a covert agent without authorization.  See 50 U.S.C. § 421.  As a consequence, the Agency "rolled back" Ms. Wilson's "cover" – i.e., officially disclosed her status as a CIA employee – in three stages.  See Declaration of CIA Deputy Director Stephen R. Kappes at 4 (July 18, 2007) ("Unclassified Kappes

---

[3] "After Novak's column was published, various media accounts reported that other reporters had been told by government officials that Wilson's wife worked at the CIA monitoring weapons of mass destruction, and that she was involved in her husband's selection for the mission to Niger."  In re Grand Jury Subpoena, Judith Miller, 438 F.3d at 1143 (citing, inter alia, Mike Allen & Dana Priest, Bush Administration Is Focus of Inquiry; CIA Agent's Identity Was Leaked to Media, WASH. POST, Sept. 28, 2003, at A1 (reporting that "two top White House officials called at least six Washington journalists and disclosed the identity and occupation of Wilson's wife")).

8

Declaration").[4] First, in December 2003, "as a result of the [Novak column] and subsequent media reporting of Ms. Wilson's relationship with the CIA," the Agency "lifted Ms. Wilson's cover effective 14 December 2003." Id. (emphasis added). Second, in February 2004, the Agency "rolled back [Ms. Wilson's] cover effective 14 July 2003, the date of the [Novak disclosure]." Id. (emphasis added). Third, in October 2005, to facilitate the prosecution of I. Lewis Libby, the Vice President's Chief of Staff, for perjury and obstruction of justice,[5] "the CIA, exercising its discretion under section 3.1(b)" of Executive Order 13,292, "determined that the public interest in the disclosure of Ms. Wilson's employment and cover status" for the period beginning January 1, 2002 – i.e., the year of her husband's trip to Niger – "outweighed the damage to national security that might reasonably be expected from disclosure" of that information, and "lifted and rolled back Ms. Wilson's cover" as of that date. Id.[6] Thus, the CIA officially disclosed that, as of January 1, 2002, Ms. Wilson was

---

[4] As discussed infra at **[46-47]**, Mr. Kappes has also submitted a classified declaration, which was reviewed in camera and ex parte by both the district court and this court without any objection by plaintiffs or their counsel.

[5] See generally United States v. Libby, 495 F. Supp. 2d 49, 51 (D.D.C. 2007) (reporting Mr. Libby's conviction and President Bush's commutation of his thirty-month prison sentence).

[6] Section 3.1(b) provides:

In some exceptional cases . . . the need to protect [classified] information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified. When such questions arise, they shall be referred to the agency head or the senior agency official. That official will determine, as an exercise of discretion, whether the public interest in disclosure outweighs the damage to the national security that might reasonably be expected from disclosure.

9

working for the CIA in its Counterproliferation Division, where she served as chief of the unit responsible for weapons proliferation issues related to Iraq. See Unclassified Summary of Valerie Wilson's CIA Employment and Cover History at 1, United States v. Libby, Cr. No. 05-394 (D.D.C. May 25, 2007).

Before this court, the Agency emphatically maintains the limited nature of these official disclosures: they "do[] not mean that the CIA acknowledges any other period of [Ms. Wilson's] employment, if any, nor do[] [they] declassify the nature and details of Ms. Wilson's cover, the cover methods employed by the CIA to protect Ms. Wilson or other covert CIA employees, or the fact, nature and details of Ms. Wilson's classified intelligence activities as a CIA employee at any time during her employment." Unclassified Kappes Declaration at 5.

C.      Ms. Wilson's Retirement Discussions with Representative Inslee and the CIA's February 10, 2006 Letter

Perceiving that disclosure of her covert status with the CIA significantly restricted her eligibility for future Agency assignments and promotions, Valerie Wilson decided to retire. Before serving formal notice of retirement, Ms. Wilson and her husband had discussions with Representative Jay Inslee (D-Wash.), to explore the possibility of a private bill that would permit Ms. Wilson to receive full retirement benefits despite the fact that she had not reached the requisite age. On November 3, 2005, Rep. Inslee's Chief of Staff, Brian Bonlender, sent Mr. Wilson a draft of such legislation, which proposed to reference his wife's years of

_____

Exec. Order 13,292, § 3.1(b), 68 Fed. Reg. 15,315, 15,320 (Mar. 23, 2003).

Agency service, information that was classified: "In January 2006, Valerie Plame Wilson will have been employed by the Central Intelligence Agency for 20 years and will be 42 years of age." E-mail from B. Bonlender to J. Wilson, attachment at 2 (Nov. 3, 2005). The draft bill further stated: "Valerie Plame Wilson should be able to receive retirement benefits from the Central Intelligence Agency after having been employed for 20 years without meeting the minimum age requirement." Id.[7] The record also reveals that, in responding to Rep. Inslee's office the following week, Ms. Wilson herself did not hesitate to discuss the classified fact of her years of Agency service: "I resign on 2jan06 with ██ years of service." E-mail from V. Wilson to B. Bonlender (Nov. 15, 2005) (redaction in copy filed with district court).

In this same e-mail, Ms. Wilson advised Mr. Bonlender that she wanted to have a "final decision" from the Agency regarding her retirement benefits "PRIOR to submitting any legislation" in order to demonstrate that "all other avenues of recourse have been attempted, etc." Id. (emphasis in original). Two weeks later, Ms. Wilson reported that she "pretty much [had] final word from the agency" that she would not be eligible to receive her retirement benefits early, but that "the agency will give me an 'official' memo to that effect." E-mail from V. Wilson to B. Bonlender (Nov. 28, 2005).

Valerie Wilson formally resigned from the CIA effective January 9, 2006. One month later, on February 10, 2006, Karen F. Tumolo, then Chief of the CIA's Retirement and

---

[7] In the district court, plaintiffs asserted that Rep. "Inslee's office confirmed that Ms. Wilson in fact had 20 years of service," without indicating when and how this classified fact was confirmed. Plaintiffs' Rule 56.1 Statement at 8.

Insurance Services Division, sent Ms. Wilson a letter regarding her retirement benefits (the "February 10 Letter" or "Letter"). The Letter was written on CIA letterhead, sent via first-class mail,[7] and contained no classification markings. It set forth the dates of Ms. Wilson's service with the CIA and explained that, by statute, Wilson was not yet eligible to receive her deferred annuity.

Shortly thereafter, Ms. Wilson reported to Rep. Inslee's Chief of Staff that she had received "an official letter" from the Agency regarding her retirement benefits, and she offered "to fax [him] the actual letter, if it would be helpful." E-mail from V. Wilson to B. Bonlender (Feb. 26, 2006). The record does not indicate precisely when Ms. Wilson forwarded the February 10 Letter to Rep. Inslee's office, but it is undisputed that she did so. No legislation pertaining to Ms. Wilson's retirement benefits was introduced in 2006, however, and plaintiffs surmise that this was because of the unlikelihood of enactment by the then-Republican-controlled Congress.

D.    Ms. Wilson's Secrecy Agreement with the CIA

When Valerie Wilson joined the CIA, she signed a standard form "Secrecy Agreement" in which she agreed "never [to] disclose in any form or any manner" information or materials obtained in the course of her employment with the CIA (1) that are "classified pursuant to Executive Order," or (2) "which reveal information, classifiable pursuant to Executive Order." CIA Form Secrecy Agreement ¶ 3. The form Agreement placed the

---

[7] The applicable regulations do not permit the transmission of classified information via first-class mail. See 32 C.F.R. § 2001.45(c).

12

burden upon Ms. Wilson to determine whether information or materials in her control were classified or classifiable, as well as to ascertain whom the CIA had authorized to receive such information or materials. See id. ¶ 4. In the Agreement, Ms. Wilson also promised as follows:

> I hereby agree to submit for review by the [CIA] all information or materials including works of fiction which contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order, which I contemplate disclosing publicly or which I have actually prepared for public disclosure, either during my employment or other service with the [CIA] or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to it. I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the [CIA].

Id. ¶ 5. The Agreement explained that the purpose of the pre-publication review process "is to give the [CIA] an opportunity to determine whether the information or materials which [Ms. Wilson] contemplate[d] disclosing publicly contain any information which [she] ha[d] agreed not to disclose." Id. ¶ 6. Ms. Wilson indicated that she understood and accepted that the conditions and obligations set forth in the agreement applied both "during [her] employment . . . and at all times thereafter." Id. ¶ 18.

E.    Ms. Wilson's Submission of Her Memoir to the CIA's Publication Review Board

In accordance with the terms of her Secrecy Agreement, in July 2006, Ms. Wilson submitted the first five chapters of her memoir to the CIA's Publication Review Board ("PRB"), the entity "charged with reviewing materials submitted by current and former

13

employees that are intended for nonofficial publication or public dissemination, to determine whether they contain classified information." Declaration of PRB Chairman Richard J. Puhl, at 1 (July 12, 2007). In September 2006, Ms. Wilson submitted her full manuscript to the PRB.

An October 2006 meeting between Ms. Wilson and the PRB to discuss the memoir was delayed due to what Ms. Wilson's attorney later described as "an internal Agency debate about the propriety of rolling back [Ms. Wilson's] cover prior to 2002." Letter from David Smallman to Ginger A. Wright, CIA Assistant General Counsel, at 3 (Jan. 9, 2007) (describing conversation between Wilson and PRB official). Ms. Wilson asserts that, when she finally met with PRB staff in November 2006, she was told that the staff thought "that prohibiting Ms. Wilson from disclosing her CIA affiliation prior to 2002 would lead to an 'absurd' and 'ludicrous' result"; nevertheless, a "decision had been made by 'the Seventh Floor,' i.e., senior Agency management, not to permit her" to make such disclosures. Id.; see also FAIR GAME at 267-70.

Shortly after the November meeting, Ms. Wilson received a letter from the PRB disapproving publication of her manuscript as "currently written." Letter from PRB Chairman R. Puhl to V. Wilson at 1 (Nov. 21, 2006). The PRB explained that the first 124 pages of the memoir were particularly problematic because the "context" in which certain matters were discussed and the "timeframes associated with the material" would "reveal

14

classified information." Id. The PRB offered to meet again with Ms. Wilson to discuss the problems identified and the deletions or changes that would be required to permit publication. Concluding that "significantly fewer and less complex changes" were necessary for pages 125-243 of the manuscript, the PRB offered nine pages of line-by-line edits.

Ms. Wilson responded by requesting line-by-line edits to the first 124 pages of her manuscript. The PRB declined in a letter dated December 22, 2006, explaining that "[t]he first 124 pages of your manuscript are replete with statements that may be unclassified standing alone, but they become classified when they are linked with a specific time, such as an event in your personal life, or are included in another context that would reveal classified information." Letter from PRB Chairman R. Puhl to V. Wilson, at 1 (Dec. 22, 2006). The letter suggested that Ms. Wilson might address this problem by "separat[ing] certain statements or vignettes from the timeframes in which they currently appear," "remov[ing] the references to the times and events in your personal life," or, where no other option was feasible, "recast[ing]" or "fictionaliz[ing]" certain information. Id. at 1-2.

In a responsive letter dated January 9, 2007, Ms. Wilson's counsel asserted that "[t]he dates of Ms. Wilson's federal service and her government employment affiliation during specific time periods were disclosed officially by the Agency in an unclassified letter to her in February 2006." Jan. 9, 2007 Letter from D. Smallman to G. Wright at 2. Counsel also attached to his letter an 18-page chart of citations to public domain sources purporting to

15

describe Ms. Wilson's pre-2002 affiliation with the CIA, including articles discussing when she joined the Agency, where she had served, and her cover methods.[8]  Counsel submitted that, in these circumstances, preventing Ms. Wilson from telling her full story was "nonsensical" because the net effect of the Agency limitation was that "virtually anyone in the world can write about non-secret, publicly known aspects of Ms. Wilson's life – except for her."  Id. at 4 (emphasis in original).

---

[8] Illustrative of the cited news stories and books are the following:

- "[Wilson] will no longer be working under cover, as she did successfully for almost 20 years."  Timothy M. Phelps & Kurt Royce, Columnist Blows CIA Agent's Cover, NEWSDAY, July 22, 2003;

- "At 22, Plame had joined the Central Intelligence Agency and traveled the world on undercover missions."  Richard Leiby & Dana Priest, The Spy Next Door: Valerie Plame, Ideal Mom Was also the Ideal Cover, WASH. POST, Oct. 8, 2003;

- "Valerie Plame was recruited into the CIA in 1985, straight out of Pennsylvania State University."  David Corn, What Valerie Plame Really Did at the CIA, Nation Online, Sept. 6, 2006;

- "[Wilson] served a stint on the Greece desk."  Id.;

- "She spent her early years at the CIA in Europe, where she received advanced degrees from the London School of Economics and the College of Europe, in Bruges, Belgium."  "The Exposure of Valerie Plame" (CBS News television broadcast Oct. 30, 2005);

- "While most undercover agency officers disguise their real profession by pretending to be American embassy diplomats or other United States government employees, Ms. Plame passed herself off as a private energy expert [when operating overseas]." Elizabeth Bumiller, Debating a Leak: The Director; CIA Chief is Caught in Middle in Leak Inquiry, N.Y. TIMES, Oct. 5, 2003.

F.   The "Valerie Plame Wilson Compensation Act" and Public Disclosure of the February 10 Letter

As the PRB, Ms. Wilson, and her attorney pursued negotiations about the permissible content of her book, Rep. Inslee prepared to introduce – in the now Democratic-controlled Congress – his previously drafted private bill authorizing Ms. Wilson's early receipt of full retirement benefits. Toward this end, Rep. Inslee sought Ms. Wilson's permission to place in the Congressional Record a copy of the CIA's February 10, 2006 Letter. Ms. Wilson gave her approval in a January 12, 2007 letter, which states: "I have no objections to any otherwise permissible inclusion of my personal financial information as contained in [the February 10 Letter]. The letter does not contain any designation that its entire contents or any portion sets forth or references classified information. This letter was sent to me via first class mail." See Letter from V. Wilson to Rep. Inslee at 1 (Jan. 12, 2007).

On January 16, 2007, Rep. Inslee introduced the "Valerie Plame Wilson Compensation Act," H.R. 501, 110th Cong. (2007). In his floor statement, Rep. Inslee specifically referenced Ms. Wilson's "20 years of federal service." 153 Cong. Rec. E119 (daily ed. Jan. 16, 2007) (statement of Rep. Inslee). He further stated:

> I am introducing legislation to allow Mrs. Plame Wilson to qualify for her annuity, as one who has served her country for two decades, and waive the age requirement for collecting it. To best demonstrate the annuity for which Mrs. Plame Wilson may qualify if this legislation were to pass, I am submitting for the record a document sent to Mrs. Plame Wilson by the CIA. It outlines her deferred annuity and testifies to 20 years of service. The document bears no indications of classified material as required by CIA procedures, and was sent via regular postal mail after Mrs. Plame Wilson was no longer in the employ of

17

the CIA. Legal experts have assured me that this is not a classified document.[9]

Id. Rep. Inslee then placed in the record a modestly redacted version of the CIA's February 10 Letter, which stated, inter alia, "[o]ur records show that since January 1, 1987, you have acquired 6 years, 1 month and 29 days of overseas service. Following is a list of your federal service: CIA, CIA (LWOP), CIA (P/T 40), from 11/9/1985 to 1/9/2006—total of 20 years, 7 days." Id. This version of the February 10 Letter was thereafter incorporated into the Congressional Record and is now permanently available to the public, both in print and on the Internet.[10]

Three days later, Karen Tumolo – the Agency official who authored the February 10 Letter – wrote to advise Ms. Wilson that the Letter "was not properly marked to indicate its national security classification" due to "an administrative error," and that the "information contained therein" in fact "remains classified." Letter from K. Tumolo to V. Wilson at 1 (Jan. 19, 2007). Ms. Tumolo requested that Ms. Wilson return the Letter, along with any copies, to the Agency. Meanwhile, Christopher J. Walker, the CIA's Director of Congressional Affairs, similarly informed the Clerk of the House of Representatives that the February 10 Letter introduced into the Congressional Record "contains classified information

---

[9] The court record does not reflect with which "legal experts" Rep. Inslee consulted prior to introducing the Letter into the Congressional Record. The court record likewise does not reflect whether Rep. Inslee consulted with the CIA regarding the status of the information contained in the Letter.

[10] The bill itself was referred to the House Committee on Intelligence, but no further action was taken during the 110th Congress. On March 26, 2009, Rep. Inslee reintroduced the bill, which was again referred to the House Committee on Intelligence. See H.R. 1773, 111th Cong. (2009). No further action has been taken on the bill to date.

18

that was not properly marked." Letter from Christopher J. Walker, Director of Congressional Affairs, CIA, to Hon. Karen Haas, Clerk, U.S. House of Representatives at 1 (Jan. 23, 2007). Walker did not, however, request return of the Letter or any other congressional action.

On January 31, 2007, Ms. Wilson agreed to return a copy of the February 10 Letter to the CIA and requested that the Agency provide her with a redacted copy. The redacted letter so provided on April 24, 2007, discloses only Ms. Wilson's post-2002 service dates.

G.    Final Pre-Publication Review

After Rep. Inslee's public disclosure of the CIA's February 10 Letter, Ms. Wilson continued to negotiate with the PRB regarding its refusal to allow her to reference any pre-2002 CIA affiliation in her memoir. In a series of letters, Ms. Wilson's counsel argued that the February 10 Letter – which, he asserted, was disclosed to Ms. Wilson in an "unclassified" form and had since entered the public domain – represented an official acknowledgment of Ms. Wilson's dates of service with the CIA that necessarily undermined any justification for barring her from discussing those dates in her memoir. In turn, the Agency maintained that the Letter contained properly classified information that had never been officially disclosed or declassified.

After Ms. Wilson rejected the CIA's suggestion that she fictionalize or otherwise alter the first half of her manuscript, the PRB made extensive line-by-line redactions to that portion of her book, explaining that "[w]ith limited exceptions, the classified information . . . identified in your manuscript relates to a single issue, of which you are aware, and reflects the classification determination made by the Director of the Agency."

19

Letter from PRB Chairman R. Puhl to V. Wilson at 2 (Apr. 19, 2007).[11] The PRB also confirmed for Ms. Wilson that she had exhausted her administrative remedies with respect to this issue. This litigation followed.

## H.    The District Court Proceedings

On May 31, 2007, plaintiffs filed this action seeking (1) an injunction preventing defendants from barring publication of those "portions of [Ms. Wilson's memoir] that reference information officially acknowledged by defendant CIA in the February 10, 2006 letter," and (2) a declaration that, among other things, the PRB's prohibition on the publication of Ms. Wilson's pre-2002 service dates violates her First Amendment rights. Complaint at 23-24. The parties cross-moved for summary judgment and, in an opinion dated August 1, 2007, the district court granted defendants' motion and denied plaintiffs' motion. See Wilson v. McConnell, 501 F. Supp. 2d 545.

The district court noted that Ms. Wilson "is not challenging the PRB process, the PRB regulations, or her contractual secrecy obligation to the government." Id. at 548 n.3. Further, no party had asked the court "to rule on any particular redaction" to the memoir. Id. at 549 n.6. The district court identified the sole issue for decision to be "whether, or to what extent, the CIA may use Wilson's [pre-2002] dates of service as a basis for censor[ship] on national security grounds." Id.

_____

[11] Before the district court, "the parties agree[d] that th[is] 'single issue' either is, or encompasses, the CIA's determination that Wilson cannot disclose her dates of CIA service prior to 2002, if any." Wilson v. McConnell, 501 F. Supp. 2d at 549. As discussed further infra at **[42-43]**, this single issue raises more than a narrow chronological concern.

20

In ruling in favor of defendants, the district court determined that (1) Ms. Wilson's pre-2002 service dates had been properly classified prior to the issuance of the February 10 Letter; (2) those dates were never formally declassified by the Agency; and (3) the February 10 Letter was not an "official acknowledgment" of Ms. Wilson's service dates because (a) the Letter was sent only to Wilson and, thus, was not a public disclosure; and (b) the subsequent public disclosure of the Letter by Ms. Wilson and Rep. Inslee was not "official" because it was not attributable to the CIA. Id. at 552-60.

Plaintiffs timely filed notice of this appeal on September 28, 2007.

I.     Publication of FAIR GAME

Approximately one month later, on October 22, 2007, Simon & Schuster published Fair Game with the redactions required by the PRB rendered in the text as blacked-out lines. The book opens with a "Publisher's Note" explaining that many of the CIA's required redactions "relate[] to material that would disclose Ms. Wilson's dates of service, information that has already been widely disseminated." FAIR GAME at ix. The note advises readers that the redacted information is effectively being provided in an afterword written by someone other than Ms. Wilson:

> To enhance the reader's experience Simon & Schuster has added
> an afterword by reporter Laura Rozen. Drawn from interviews
> and public sources, it provides historical background and
> recounts portions of Ms. Wilson's life and career that she was
> unable to include herself. When the afterword is read together
> with Fair Game, a full and vivid picture of Valerie Plame
> Wilson emerges. Ms. Wilson has had no input or involvement
> in the creation of the afterword, which she has not seen before
> publication of this book.

21

Id. The afterword purports to describe, among other things, Ms. Wilson's entry into the CIA in 1985, see id. at 313; her first foreign assignment to Athens, Greece, and the diplomatic cover she used on that tour, see id. at 319-31; and her transition to "nonofficial cover" in the 1990s, during which time she posed as an "energy consultant," id. at 333-48.

## II.    Discussion

### A.    Standard of Review

"We review an award of summary judgment de novo," and we "will uphold the judgment if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment is warranted as a matter of law." Global Network Commc'ns, Inc. v. City of New York, 562 F.3d 145, 150 (2d Cir. 2009). Before applying this standard to plaintiffs' challenges to the judgment in this case, we outline the legal framework relevant to our analysis.[12]

### B.    The Legal Framework Relevant to Plaintiffs' First Amendment Claim

#### 1.    CIA Employees Have No First Amendment Right To Disclose Properly Classified Information

It is a bedrock principle of First Amendment jurisprudence that "'[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity.'" New York Times Co. v. United States, 403 U.S. 713, 714 (1971) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)). The CIA's requirement that current and former

_____

[12] We note at the outset that defendants contend, somewhat halfheartedly, that the publication of Ms. Wilson's book renders this action moot. Insofar as (1) the book was published with the CIA's redactions, and (2) plaintiffs represent that they will publish a revised, unredacted version of the book if they prevail here, defendants' contention is rejected as without merit.

employees obtain Agency clearance before disseminating any material related to their employment is not, however, a "system of prior restraints" in the classic sense. See McGehee v. Casey, 718 F.2d 1137, 1147-48 (D.C. Cir. 1983); accord John Doe, Inc. v. Mukasey, 549 F.3d 861, 871, 876 n.12 (2d Cir. 2008).

As the Supreme Court has explained, when a government employee "voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." United States v. Aguilar, 515 U.S. 593, 606 (1995); see United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465-66 (1995) ("Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."); cf. John Doe, Inc. v. Mukasey, 549 F.3d at 877 (distinguishing between former CIA employees and entities that "had no interaction with the Government until the Government imposed its nondisclosure requirement upon [them]"). Indeed, once a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee "simply has no first amendment right to publish" such information.[13] Stillman v. CIA, 319 F.3d 546, 548

_____

[13] As explained in Department of Navy v. Egan, 484 U.S. 518 (1988):

Since World War I, the Executive Branch has engaged in efforts to protect national security information by means of a classification system graded according to sensitivity. After World War II, certain civilian agencies, including the Central Intelligence Agency, the National Security Agency, and the Atomic Energy Commission, were entrusted with gathering, protecting, or creating information bearing on national security. Presidents, in a series of Executive Orders, have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch by delegating this

23

(D.C. Cir. 2003); see United States v. Pappas, 94 F.3d 795, 801 (2d Cir. 1996) ("The Government is entitled to enforce its agreements to maintain the confidentiality of classified information."); Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1370 (4th Cir. 1975) (holding that government employee subject to secrecy agreement has "effectively relinquished his First Amendment right[]" to publish classified information).

This rule derives principally from Snepp v. United States, 444 U.S. 507 (1980), in which the Supreme Court rejected a First Amendment challenge to the CIA's enforcement of its secrecy agreement with former employee Frank W. Snepp III, who had published a book about CIA activities in South Vietnam without submitting his manuscript for pre-publication Agency review. The Court affirmed the district court's order enjoining future breaches by Snepp and imposing a constructive trust on profits already realized from the unauthorized publication, see id. at 508-09, concluding not only that Snepp's secrecy agreement was enforceable as an "entirely appropriate exercise of the CIA Director's

responsibility to the heads of agencies.

Id. at 527; see generally DANIEL PATRICK MOYNIHAN ET AL., REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY, S. DOC. NO. 105-2, app. A ("Secrecy: A Brief Account of the American Experience") (1997); Harold C. Relyea, Cong. Research Serv., "Security Classified and Controlled Information: History, Status and Emerging Management Issues" 2-5 (2008) (reviewing history of classification system).

Presidential "authority to classify and control access to information bearing on national security . . . flows primarily from" Article II, Section 2 of the Constitution "and exists quite apart from any explicit congressional grant." Department of Navy v. Egan, 484 U.S. at 527; see also Jennifer K. Elsea, Cong. Research Serv., "The Protection of Classified Information: The Legal Framework" 2-3 (2006) (discussing relatively limited congressional intervention in information classification); MOYNIHAN ET AL., REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY 11 (discussing lack of statutory basis for classification regime). The procedure for classifying and declassifying information is currently governed by Executive Order 13,292, 68 Fed. Reg. 15,315.

statutory mandate to protect intelligence sources and methods from unauthorized disclosure,"

but also that "even in the absence of an express agreement – the CIA could have acted to

protect substantial government interests by imposing reasonable restrictions on employee

activities that in other contexts might be protected by the First Amendment," id. at 510 n.3

(internal quotation marks and alteration omitted).  The Court held that "[t]he Government has

a compelling interest in protecting both the secrecy of information important to our national

security and the appearance of confidentiality so essential to the effective operation of our

foreign intelligence service," and that "[t]he agreement that Snepp signed is a reasonable

means for protecting this vital interest."  Id.; see also Haig v. Agee, 453 U.S. 280, 283, 309

(1981) (holding that ex-CIA employee's speech intended "'to expose CIA officers and

agents'" is "clearly not protected by the Constitution").  Moreover, the Court recognized the

CIA's need to maintain a "dependable prepublication review procedure" in order to "ensure

in advance . . . that information detrimental to national interest is not published."  Snepp v.

United States, 444 U.S. at 513 n.8.

        2.      Defendants' Inability To Prevent Publication of Information that Is Unclassified or Not Properly Classified

By contrast, "[t]he government has no legitimate interest in censoring unclassified

materials," and, thus, "may not censor such material, contractually or otherwise."  McGehee

v. Casey, 718 F.2d at 1141 (internal quotation marks omitted); see also Snepp v. United

States, 444 U.S. at 513 n.8 ("If in fact information is unclassified or in the public domain,

25

neither the CIA nor foreign agencies would be concerned.").[14] Consistent with this principle, CIA regulations provide that "[t]he PRB will review material proposed for publication or public dissemination <u>solely</u> to determine whether it contains any classified information." Agency Prepublication Review of Certain Material Prepared for Public Dissemination § 2(f)(2) (2005) (emphasis added).

Moreover, if the Agency censors a manuscript because it contains classified information, the author is entitled to judicial review of that decision to ensure that the information in question is, in fact, properly classified under the standards set forth in the applicable executive order. <u>See</u> <u>McGehee v. Casey</u>, 718 F.2d at 1148 (holding that Agency employee retains "a strong first amendment interest in ensuring that CIA censorship of his [work] results from a proper classification of the censored portions"; <u>United States v. Marchetti</u>, 466 F.2d 1309, 1317 (4th Cir. 1972) (noting right to judicial review in this context); <u>see also</u> <u>Snepp v. United States</u>, 444 U.S. at 513 n.8 (observing that CIA clearance procedure is "subject to judicial review"). Such judicial review is necessarily deferential because the designation and protection of classified information "must be committed to the broad discretion of the agency responsible." <u>Department of Navy v. Egan</u>, 484 U.S. 518, 529 (1988). Deferential review, however, does not equate to no review. <u>See</u> <u>John Doe, Inc. v. Mukasey</u>, 549 F.3d at 881 (citing <u>Gutierrez de Martinez v. Lamagno</u>, 515 U.S. 417, 426 (1995)). A court must satisfy itself "from the record, <u>in camera</u> or otherwise, that the CIA

---

[14] This case does not implicate the concerns discussed in <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006) (holding that statements made by current public employees pursuant to their official duties, rather than as citizens, are not protected by the First Amendment).

in fact had good reason to classify, and therefore censor, the materials at issue." McGehee

v. Casey, 718 F.2d at 1149. To that end, a court may "require that CIA explanations justify

censorship with reasonable specificity, demonstrating a logical connection between the

deleted information and the reasons for classification." Id.; see also John Doe, Inc. v.

Mukasey, 549 F.3d at 875, 881.[15] The court's task is not to second-guess the Agency, but

simply to ensure that its "reasons for classification are rational and plausible ones."

McGehee v. Casey, 718 F.2d at 1149.[16]

---

[15] John Doe, Inc. v. Mukasey addressed the constitutionality of statutes authorizing the FBI to prohibit communication service providers from disclosing receipt of National Security Letters upon certification by senior FBI officials that disclosure may result in "danger to the national security . . . , interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." 18 U.S.C. § 2709(c)(1); see John Doe, Inc. v. Mukasey, 549 F.3d at 867 & n.7. By statute, Congress empowered federal courts to modify or set aside a nondisclosure requirement if it found "no reason" to support the certification. 18 U.S.C. § 3511(b)(2); see John Doe, Inc. v. Mukasey, 549 F.3d at 868 & n.9, 875. Citing McGehee v. Casey, 718 F.2d at 1148, we accepted the government's position "that 'reason' in the quoted phrase means 'good reason.'" John Doe, Inc. v. Mukasey, 549 F.3d at 875. Furthermore, echoing the standards outlined above, we required the government "at least [to] indicate the nature of the apprehended harm and provide a court with some basis to assure itself (based on in camera presentations where appropriate) that the link between disclosure and risk of harm is substantial." Id. at 881.

[16] A similar standard applies in the FOIA context, see Halpern v. FBI, 181 F.3d 279, 291 (2d Cir. 1999), in which district courts are authorized to undertake "de novo" review of an agency's decision to withhold records under one of the statute's exemptions, including the exemption for properly classified information, see 5 U.S.C. § 552(a)(4)(B). Likewise, when reviewing the government's invocation of the state-secrets privilege, "the district court must be 'satisf[ied] . . . from all the circumstances of the case[ ] that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.'" Doe v. CIA, No. 07-0797-cv, 2009 WL 2382751, at *6 (2d Cir. Aug. 5, 2009) (quoting United States v. Reynolds, 345 U.S. 1, 10 (1953)).

27

3. Defendants' Inability To Prevent Publication of Information that Has Been "Officially Disclosed" by the CIA

Finally, the CIA cannot prevent a former employee from publishing even properly classified information once the Agency itself has officially disclosed it. See Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007); Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d 414, 421 (2d Cir. 1989). Although this doctrine was developed in the FOIA context, the Agency does not dispute that it may be invoked to challenge the PRB's censorship decision here. As the Fourth Circuit recognized in reviewing such a claim, a former CIA agent "should not be denied the right to publish information which any citizen could compel the CIA to produce and, after production, could publish." Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1367.

A strict test applies to claims of official disclosure. Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) "[is] as specific as the information previously released," (2) "match[es] the information previously disclosed," and (3) was "made public through an official and documented disclosure." Wolf v. CIA, 473 F.3d at 378 (internal quotation marks omitted); see also Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d at 421 (holding that government may not withhold information under FOIA exemption 1 when "the government has officially disclosed the specific information being sought" (emphasis in original)).

The last factor acknowledges "a critical difference between official and unofficial disclosures" of information classified by the CIA. Fitzgibbon v. CIA, 911 F.2d 755, 765

28

(D.C. Cir. 1990). As a practical matter, foreign governments can often ignore unofficial disclosures of CIA activities that might be viewed as embarrassing or harmful to their interests. See Afshar v. Dep't of State, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983). They cannot, however, so easily cast a blind eye on official disclosures made by the CIA itself, and they may, in fact, feel compelled to retaliate. See id. Mindful of this reality, the law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter, see Wolf v. CIA, 473 F.3d at 378; Afshar v. Dep't of State, 702 F.2d at 1130-31; Fitzgibbon v. CIA, 911 F.2d at 766; (2) statements made by a person not authorized to speak for the Agency, cf. Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d at 421; or (3) release of information by another agency, or even by Congress, see Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999); Earth Pledge Found. v. CIA, 988 F. Supp. 623, 628 (S.D.N.Y. 1996), aff'd 128 F.3d 788 (2d Cir. 1997).

With these principles in mind, we consider the record in this case.

C.    Ms. Wilson's Pre-2002 Employment History with the CIA Has Not Been Officially Disclosed and Remains Properly Classified

Plaintiffs do not challenge the district court's determination that Ms. Wilson's pre-2002 employment history with the CIA was, as an original matter, properly classified. See Wilson v. McConnell, 501 F. Supp. 2d at 552-55; Appellants' Reply Br. at 7. In fact, plaintiffs acknowledge that, prior to Robert Novak's July 14, 2003 column, "[Ms.] Wilson's employment affiliation with the CIA . . . was highly classified." Appellants' Br. at 6. Moreover, plaintiffs do not contend that Novak's column, the press reports that followed

29

purporting to describe Ms. Wilson's CIA career, or the CIA's decision to "roll back" her cover as of January 1, 2002, either declassified Ms. Wilson's pre-2002 status or officially disclosed that information. As the authority cited above makes clear, any such contention would be wholly without merit in any event, as neither press reports nor prior disclosures of information that do not "match" the information in question can officially disclose properly classified information. Wolf v. CIA, 473 F.3d at 378.[17]

Instead, plaintiffs and their amici advance two different arguments, based almost exclusively on the CIA's February 10 Letter, to support their claim of a First Amendment right to publish Ms. Wilson's pre-2002 dates of service. See Appellants' Reply Br. at 7 (conceding that absent Agency's "voluntary release" of this letter, present lawsuit would have been "unwarranted"). First, they submit that the February 10 Letter, sent by first-class mail without any classification markings, constitutes an official CIA disclosure of Ms. Wilson's pre-2002 service dates with the Agency. They assert that this disclosure, in turn, proximately caused the public revelation of the Letter by Rep. Inslee. Second, plaintiffs and amici argue that, even if this series of events did not officially disclose Ms. Wilson's service

---

[17] We reject on similar grounds plaintiffs' contention – raised for the first time on rebuttal at oral argument – that the reference to Executive Order 12,356 in the now-public, partially redacted version of Ms. Wilson's Secrecy Agreement officially disclosed the fact of her CIA employment sometime before October 14, 1995, the date on which that order was revoked. See Exec. Order 12,958, § 6.1, 60 Fed. Reg. 19,825, 19,842-43 (Apr. 17, 1995) (revoking Exec. Order 12,356). This stray reference to an executive order is neither "as specific as" the information Ms. Wilson seeks to publish, nor does it "match" that information. Wolf v. CIA, 473 F.3d at 378. Moreover, as defendants note, the Secrecy Agreement refers not simply to Executive Order 12,356, but to "Executive Order 12356 as amended or superseded, or other applicable Executive Order." CIA Form Secrecy Agreement ¶ 3.

dates, the public availability of the Letter and the information contained therein deprives the CIA of its original justification for maintaining this information as classified, i.e., that "the unauthorized disclosure" of this information "reasonably could be expected to result in damage to the national security." Exec. Order 13,292, § 1.1(a)(4), 68 Fed. Reg. at 15,315-16. We consider each of these arguments in turn.

### 1.     The February 10 Letter Does Not Constitute an Official Disclosure

Plaintiffs' official disclosure argument is unpersuasive for two reasons: (a) the February 10 Letter to Ms. Wilson did not constitute a "disclosure," and (b) the Letter was not "made public" by the CIA.  Moreover, we reject plaintiffs' contention that the Agency is chargeable with official disclosure because, through administrative negligence, it "proximately caused" public disclosure of the Letter by Ms. Wilson and Rep. Inslee.

### a.     CIA Transmittal of the Letter to Ms. Wilson Does Not Qualify as a "Disclosure"

The term "disclosure" does not reasonably encompass CIA transmittal of classified information to a former employee who (1) already knows the information in question, and (2) is contractually obligated to maintain the confidentiality of classified and classifiable information.  The most common meanings of "disclose" are "to open up," "to expose to view," and "[to] lay open or uncover (something hidden from view)."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 645 (1986).  Plainly, Ms. Wilson's dates of service were not something hidden from her.  To the extent the word "disclose" also suggests an "open[ing] up to general knowledge," id., the transmittal of a letter containing personnel

31

information only to the person referenced hardly demonstrates such a disclosure. Finally, although Ms. Wilson was no longer employed by the Agency on February 10, 2006, neither party suggests that Ms. Wilson was not authorized to receive the Letter or the information contained therein. Sending her the Letter was thus akin to providing classified information "to individuals with proper security clearance," which, we have held, cannot constitute an official disclosure. Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d at 422.

b. The February 10 Letter Was Not "Made Public" By the CIA

The official disclosure doctrine applies only when classified information is "made public." Wolf v. CIA, 473 F.3d at 378. Plaintiffs argue that the CIA's February 10 Letter qualifies as a "public" document under the Federal Records Act, 44 U.S.C. § 3301, and Federal Rule of Evidence 902. The Letter might be considered a "public" document in the sense that it was created by a federal agency "in connection with the transaction of public business," 44 U.S.C. § 3301, see also Fed. R. Evid. 902(2) (providing that no extrinsic evidence of authenticity is required to admit domestic public documents not under seal under certain conditions), but this is beside the point. The Letter was not "public" in the sense relevant to the official disclosure doctrine. Specifically, the Letter was not a "matter[] of public record" that could be "easily discoverable" by any interested member of the public, the twin factors we identified as critical to official disclosure in Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d at 422. The February 10 Letter was private correspondence sent directly – and only – to Ms. Wilson at her home. We conclude that such

32

a limited transmittal of classified information to an employee contractually bound to maintain its secrecy does not constitute an official disclosure.

          c.       <u>Ms. Wilson's Decision To Permit Public Release of the Letter Does Not Manifest Official Disclosure by the CIA</u>

In urging us to reach a different conclusion, plaintiffs note that Ms. Wilson sought the February 10 Letter to facilitate Rep. Inslee's legislative efforts on her behalf – efforts that would foreseeably involve public disclosure of the Letter's contents on the floor of Congress. The argument is defective in a critical respect: plaintiffs adduce no evidence that, prior to transmittal of the February 10 Letter to Ms. Wilson, anyone at the CIA was aware that the Wilsons were communicating with Rep. Inslee, much less that they were urging him to introduce legislation on her behalf.

To be sure, the February 10 Letter did become a matter of public record when Rep. Inslee placed it in the <u>Congressional Record</u> on January 16, 2007. Plaintiffs contend that this public disclosure is chargeable to the CIA as the equivalent of official disclosure because of the Agency's admitted negligence in failing to mark the Letter as classified or to utilize appropriate procedures for transmitting classified information. <u>See</u> Declaration of Karen F. Tumolo, Senior Benefits Specialist, OPR, CIA, at 3-4 (acknowledging that CIA "neglected to perform . . . classification review of Ms. Wilson's personnel file" before sending the Letter, and conceding that it was a "mistake to mail the improperly marked letter containing classified information to Ms. Wilson"). Plaintiffs submit that, in the absence of such markings or procedures, it was reasonably foreseeable to the CIA that Ms. Wilson would (1)

33

conclude that the information contained in the Letter was unclassified and that there were "no restrictions on its further dissemination," Appellants' Reply Br. at 2; and (2) ultimately make the Letter public. This argument fails for two reasons.

First, even if we were to assume that when Ms. Wilson and Rep. Inslee decided to make the February 10 Letter public, they acted in the good faith – but mistaken – belief that the information contained therein was no longer classified, that would not demonstrate official disclosure by the CIA.[18] A former employee's public disclosure of classified information cannot be deemed an "official" act of the Agency. Like the retired Admiral in Hudson River Sloop Clearwater, Inc., Ms. Wilson, as a retired CIA employee, could not

_____

[18] Such an assumption requires overlooking at least two issues. First, Ms. Wilson's Secrecy Agreement with the CIA placed "the burden . . . upon [her] to learn whether information or materials within [her] control are considered by the [CIA] to" be classified or classifiable, "and whom the Agency has authorized to receive it." CIA Form Secrecy Agreement ¶ 4. Defendants did not assert in the district court that Ms. Wilson violated the Secrecy Agreement in providing the February 10 Letter to Rep. Inslee or in approving its public disclosure. We therefore do not address that possibility here. We note simply that, were a factfinder to conclude that Ms. Wilson had violated her Secrecy Agreement in this manner, her claim would most certainly fail because "[a] public official in a confidential relationship surely may not leak information in violation of the confidence reposed in him and use the resulting publication as legitimating his own subsequent open and public disclosure of the same information." Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370.

Second, the record indicates that Ms. Wilson was speaking openly about the longevity of her CIA service prior to her receipt of the Letter in February 2007. In e-mail exchanges in November 2005 – three months before she received the February 10 Letter – Ms. Wilson and Rep. Inslee's Chief of Staff frankly discussed her total years of service with the CIA, information that, plaintiffs concede, was then classified. See E-mail from B. Bonlender to J. Wilson, attachment at 2 (Nov. 3, 2005) (stating in draft legislation that "[i]n January 2006, Valerie Plame Wilson will have been employed by the [CIA] for 20 years and will be 42 years of age"); E-mail from V. Wilson to B. Bonlender (Nov. 15, 2005) (stating years of service Ms. Wilson would have when she resigned on January 2, 2006). We do not rely on this point, however, as the record does not indicate whether Mr. Bonlender was properly authorized to receive this information.

34

"effect an <u>official</u> disclosure of information." 891 F.2d at 421 (emphasis added). The decision to permit the public release of the Letter by Rep. Inslee was indisputably <u>Ms. Wilson's</u>, not the CIA's. She possessed, in the privacy of her home, the only copy of the Letter outside of the Agency's walls, and it would have remained there but for her decision (1) to send it to Rep. Inslee, and (2) to give her permission for him to place it in the <u>Congressional Record</u>. Thus, even if Agency negligence in transmitting the Letter to Ms. Wilson somehow excuses her actions in allowing Rep. Inslee to make the classified information public, it cannot, as a matter of law, support a finding that her actions and those of Rep. Inslee effected an official disclosure of classified information <u>by the CIA</u>.[19]

Second, we decline plaintiffs' invitation to rely on the doctrine of "proximate cause" to conclude that the placement of the February 10 Letter into the <u>Congressional Record</u> is attributable to the CIA as the foreseeable result of Ms. Tumolo's negligence in failing properly to mark or send the Letter. Even assuming that proximate cause could play a part in a determination of official disclosure, the principle cannot be applied in this case.

Ms. Wilson gave Rep. Inslee permission to publish the CIA Letter on January 12, 2007. Plaintiffs assert that this decision was the natural result of Ms. Tumolo's negligence, as Ms. Wilson would have to have been a "mind-reader" to understand that the information

_____

[19] The Agency's pre-publication review process is, in fact, designed to avoid the sort of problems that can arise when former agents attempt to resolve for themselves any ambiguities in the classification status of certain information. See generally <u>Snepp v. United States</u>, 444 U.S. at 512 ("When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA – with its broader understanding of what may expose classified information and confidential sources – could have identified as harmful.")

contained in the Letter was classified in light of the Letter's "unclassified form." Appellants' Reply Br. at 2; Appellants' Br. at 1, 17, 23, 30. This argument confronts two hurdles: (1) Executive Order 13,292, which expressly states that "[i]nformation assigned a level of classification under this or predecessor orders shall be considered as classified at that level of classification despite the omission of other required markings," Exec. Order 13,292, § 1.6(f), 68 Fed. Reg. at 15,318 (emphasis added); and (2) the inquiry obligation imposed by the standard CIA Secrecy Agreement, see supra at **[12-13]**. Both strongly suggest that even if a former CIA employee might point to the lack of proper markings on a document to excuse her own disclosure of classified information, the law should not identify official disclosure in such circumstances on a theory of proximate cause. In any event, we reject plaintiffs' proximate cause argument for a more fundamental reason, namely, that it is effectively refuted by the chronological record.

By January 2007, when Ms. Wilson authorized Rep. Inslee to include the February 10 Letter in the Congressional Record, she and her attorney had already conducted months of negotiations with the PRB over the content of her memoir. During these negotiations, by Ms. Wilson's own account, the PRB repeatedly advised her that her pre-2002 status remained classified and could not be publicly disclosed.[20] Indeed, the central purpose of the letter sent

___

[20] Plaintiffs are therefore mistaken when they state: "When Wilson submitted the manuscript of her Memoir . . . for the required pre-publication review, CIA sought to prohibit [her] from republishing the identical information describing her dates of federal service that had entered the public domain through the legislative process." Appellants' Br. at 22 (emphasis added). At the time Ms. Wilson submitted her memoir to the PRB – the first section in July 2006, and the full manuscript in September 2006 – the introduction of the February 10 Letter into the Congressional Record was still several months away.

by Ms. Wilson's attorney to the PRB on January 9, 2007 – just three days before Ms. Wilson gave Rep. Inslee permission to disclose the Letter – was to object to the decision of "senior Agency management . . . not to permit her to disclose her Agency affiliation prior to 2002." Jan. 9, 2007 Letter from D. Smallman to G. Wright, at 2. Moreover, the CIA's position on this point was relayed to Ms. Wilson personally and at some length in a November 2006 meeting. See id. at 3; FAIR GAME 267-70. Thus, even if Agency negligence in the transmittal of the February 10 Letter could have prompted Ms. Wilson mistakenly to assume that her pre-2002 dates of service with the CIA were no longer classified, that misimpression was plainly corrected during her 2006 negotiations with the PRB before she gave Rep. Inslee permission to place the Letter into the Congressional Record. In light of this sequence of events, Ms. Wilson's decision to permit public disclosure of the Letter was not the "normal or foreseeable consequence of the situation created by the defendant[s'] negligence," but rather an action "independent of . . . defendants' conduct." Becker v. Poling Transp. Corp., 356 F.3d 381, 392 (2d Cir. 2004) (quoting Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169 (1980) (discussing proximate cause generally)). Thus, we easily reject as without merit plaintiffs' argument that CIA negligence could be deemed the "proximate cause" of Rep. Inslee's public disclosure of Ms. Wilson's pre-2002 dates of service.[21]

---

[21] In light of this conclusion, we need not here decide whether, as defendants maintain, official disclosure requires a demonstration of specific Agency intent at a high executive level. See Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1369 (noting that prior official disclosures "were the result of high level executive decisions that disclosure was in the public interest").

In sum, we reject as a matter of law plaintiffs' reliance on official Agency disclosure as a ground for challenging the award of summary judgment in favor of defendants.

2.      Ms. Wilson's Pre-2002 Employment Status with the CIA Remains Properly Classified

A liberal reading of the briefs filed by plaintiffs and their amici reveals a possible alternative argument in support of Ms. Wilson's claimed First Amendment right to publish her pre-2002 employment status. While acknowledging that "protecting . . . the secrecy of information important to our national security" is a "compelling interest" that justifies censoring a former agent's public statements, Snepp v. United States, 444 U.S. at 510 n.3, plaintiffs and their amici submit that where, as here, the information the former agent seeks to discuss is already in the public domain and, thus, no longer "secret," that interest is weakened and, indeed, overcome by the former agent's strong First Amendment right to participate in the "free discussion of governmental affairs," Buckley v. Valeo, 424 U.S. 1, 14 (1976) (internal quotation marks omitted). They emphasize that, even if Ms. Wilson's pre-2002 dates of service were correctly classified at the outset and have not been "officially disclosed" by the CIA, the form in which that information is present in the public domain – a signed letter from a CIA employee "in a position to know of [the information] officially," Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370 – is one that leaves little doubt as to the information's accuracy and serves clear notice on foreign intelligence services of Ms. Wilson's probable pre-2002 Agency affiliation. Further, plaintiffs and their amici note that Ms. Wilson is required by CIA regulations to include a disclaimer in her book stating that its

38

contents should not "be construed as asserting or implying U.S. Government authentication of information." See FAIR GAME at copyright page. Thus, they assert that any discussion by Ms. Wilson of her pre-2002 employment status would not "lend credence to" the information already contained in the publicly available February 10 Letter, Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370; nor would her disclosure have the same diplomatic repercussions as an official acknowledgment of that information by the CIA, see Afshar v. Dep't of State, 702 F.2d at 1134.

The precise legal challenge underlying this argument is not clearly stated. Nevertheless, we identify two possibilities, neither of which has merit.

### a. The Minimal Harm Argument

Plaintiffs' argument could be construed to assert that, even if Ms. Wilson's pre-2002 dates of service have not been officially disclosed and remain properly classified, because identical information is already in the public domain, the harm that would result from her discussion of that information is either negligible or nonexistent and the CIA's interest in preventing such an imperceptible harm is insufficient to overcome her First Amendment rights. This argument overlooks a critical fact: as a condition of her employment with the CIA, Ms. Wilson signed a contract forever waiving her right to "disclose in any form or in any manner . . . information which is classified pursuant to Executive Order and which I have obtained during the course of my employment or other service with the Central Intelligence Agency." CIA Form Secrecy Agreement ¶ 3. This contract is binding and enforceable. See,

e.g., <u>Snepp v. United States</u>, 444 U.S. at 510 n.3; <u>United States v. Pappas</u>, 94 F.3d at 801; <u>Alfred A. Knopf, Inc. v. Colby</u>, 509 F.2d at 1270.

Ms. Wilson, "of course, could have refused to sign" a Secrecy Agreement with the CIA, "but then [s]he would not have been employed, and [s]he would not have been given access to the classified information [s]he may now want to broadcast." <u>United States v. Marchetti</u>, 466 F.2d at 1316. Having chosen to sign the required Secrecy Agreement, and not having received a release from her obligations thereunder, <u>see</u> CIA Form Secrecy Agreement ¶ 13, Ms. Wilson remains bound by its terms, which do not include an exception permitting her to discuss information that remains classified provided that little or no harm would result. No different conclusion is warranted by the fact that Ms. Wilson is obliged to disclaim in her memoir any CIA authentication of facts discussed therein.[22]

b.      The Continued Classification Argument

Plaintiffs and their <u>amici</u> might also be understood to challenge the CIA's continued classification of Ms. Wilson's dates of service on the ground that no further harm can come

---

[22] The PRB regulations provide for the Agency to consider the extent to which classified information has otherwise entered the public domain in reviewing publication requests by employees subject to Secrecy Agreements:

> When otherwise classified information is also available independently in open sources and can be cited by the author, the PRB will consider that fact in making its determination on whether that information may be published with the appropriate citations. Nevertheless, the Agency retains the right to disallow certain open-source information or citations where, because of the author's Agency affiliation or position, the reference might confirm the classified content.

Agency Prepublication Review of Certain Material Prepared for Public Dissemination § 2(f)(4).

from discussion of these facts in light of the public availability of the February 10 Letter. See generally Exec. Order 13,292, § 1.1, 68 Fed. Reg. at 15,315 (providing that information may only be classified if, inter alia, "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage"). As we noted supra at **[26-27]**, when the propriety of a classification is challenged, a court appropriately reviews the record, "in camera or otherwise," to ensure that the CIA has "good reason to classify, and therefore censor, the materials at issue," and that the Agency has, with "reasonable specificity, demonstrat[ed] a logical connection between the deleted information and the reasons for classification," McGehee v. Casey, 718 F.2d at 1149; see also John Doe, Inc. v. Mukasey, 549 F.3d at 881.

To the extent plaintiffs do not contest the Agency's initial classification of Ms. Wilson's dates of service, but only its decision to maintain that information as classified, defendants note that an administrative procedure is available to pursue declassification first with the CIA and, if unsuccessful, on appeal to the Interagency Security Classification Appeals Panel. See Exec. Order 13,292 §§ 3.5, 5.3, 68 Fed. Reg. at 15,323-24, 15,328; see Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1369-70 (discussing predecessor order); see also Exec. Order 13,292 § 1.8, 68 Fed. Reg. at 15,319 (permitting "classification challenges" by "[a]uthorized holders of information"); 32 C.F.R. § 2001.14(a) (defining "authorized holders" to include "individual[s] external to the agency, who ha[ve] been granted access to specific classified information in accordance with the provisions of the" applicable executive

41

order). This Appeals Panel consists of senior-level representatives of the Departments of State, Defense, and Justice, the CIA, the National Archives, and the President's Assistant for National Security Affairs. See Exec. Order 13,292, § 5.3(a)(1), 68 Fed. Reg. at 15,328. Thus, as the Fourth Circuit has observed, this Panel's members likely have a better background "than any judge . . . for making classification and declassification decisions." Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370. We need not, however, here decide a question not specifically briefed by the parties, i.e., whether a former CIA employee should be required to pursue this administrative option before challenging the propriety of continued classification in a federal court action. We conclude that, in any event, plaintiffs' continuing classification challenge is without merit.

In determining whether the CIA still has good reason to classify Ms. Wilson's pre-2002 dates of service, we note that the Agency's underlying concern is not limited to the simple disclosure of a few dates. If Ms. Wilson were to state in her memoir, "I was a CIA operative from date X," then any discussion of her activities after that date, whether by Ms. Wilson or others, would necessarily reveal CIA "sources and methods," information that lies at "the heart of all intelligence operations." CIA v. Sims, 471 U.S. 159, 167 (1985).[23] For

---

[23] As the court observed at oral argument,

> the Agency's . . . concern is, that if it's known that [Ms. Wilson] was a CIA operative from date X rather than date Y, and you then knew that she had been a butcher, a baker, or a candlestick maker during that period, that would disclose to those interested in finding out that . . . the CIA placed people in those positions, that she in particular, in dealing with people . . . was a CIA operative and not what she appeared to be. . . . [T]hat's the concern here.

Oral Arg. Tr. at 18 (Jan. 8, 2009).

42

this reason, the Supreme Court has recognized the CIA's authority to preclude disclosure of even "superficially innocuous information" when it might facilitate the discovery of more sensitive matters. Id. at 178; see also Larson v. Dep't of State, 565 F.3d 857, 863 (D.C. Cir. 2009) (recognizing that "seemingly trivial details may be of great significance to foreign intelligence services with a broad view of the intelligence landscape in their attempts to discover and thwart CIA intelligence-gathering methods"). Indeed, the CIA explained this precise concern to Ms. Wilson in 2006, observing that her disclosure of the "specific time" of her CIA employment, when combined with other information in her memoir "that may be unclassified standing alone," could reveal sources and methods of agency intelligence operations. Letter from PRB Chairman R. Puhl to V. Wilson, at 1. Accordingly, we must assess the impact of Ms. Wilson's proposed discussion of her dates of service not in isolation, "but also with regard to what secrets [those facts] could divulge when viewed in light of other information available to interested observers." Berman v. CIA, 501 F.3d 1136, 1143 (9th Cir. 2007).[24]

---

[24] Ms. Wilson cogently made a similar point to Congress in describing the damage caused by the initial disclosure of her CIA affiliation in the media:

> The CIA goes to great lengths to protect all of its employees, providing at significant taxpayer's expense painstakingly devised covers for its most sensitive staffers. The harm that is done when a CIA cover is blown is grave, but I can't provide details beyond that in this public hearing. But the concept is obvious. Not only have breaches of national security endangered CIA officers, it has jeopardized and even destroyed entire networks of foreign agents who, in turn, risk their own lives and those of their families to provide the United States with needed intelligence. Lives are literally at stake.

White House Procedures for Safeguarding Classified Information: Hearing Before the H. Comm. on Oversight & Government Reform, 110th Cong. 18 (2007) (statement of Valerie

43

Plaintiffs do not disagree that Ms. Wilson's dates of service should be viewed in this broader context. Rather, plaintiffs contend that whatever injury to our national security the CIA could legitimately fear from the disclosure of Ms. Wilson's pre-2002 dates of service was sustained when the February 10 Letter became public. Thereafter, continued classification is no longer reasonable. We are not convinced.

Plaintiffs' argument is at odds with Section 1.1(b) of Executive Order 13,292, which provides that classified information is "not . . . declassified automatically as a result of any unauthorized disclosure of identical or similar information." 68 Fed. Reg. at 15,315. To the extent plaintiffs suggest that this provision does not apply because Ms. Tumolo's transmittal of the February 10 Letter was "authorized," we reiterate that this transmittal did not effect the public disclosure of the Letter. That action was taken by Ms. Wilson herself when she gave Rep. Inslee the Letter and her permission for its public release. See supra at [32-37]. Moreover, even if Ms. Wilson's actions could be attributed to a bona fide misunderstanding, we hold that a former agent cannot use her own unauthorized disclosure of classified information as a springboard for challenging the CIA's ability to maintain that information as classified. See generally Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370 (holding that party who leaks information cannot use such disclosure to claim right openly to discuss that information).[25]

_____

Plame Wilson).

[25] In these circumstances, we cannot agree with our concurring colleague that the CIA must "explain how the harms described would be likely to result from the publication of Ms. Wilson's book, instead of, or in addition to, the publication of the February 10 Letter itself." Post at [xx]. Ms. Wilson is not entitled to the benefit of public disclosure of a document, the

Even putting aside Ms. Wilson's role in the public disclosure of the Letter, however, her challenge to the continued classification of her dates of service is unavailing. To be sure, the February 10 Letter, written on CIA letterhead and signed by an official from the Agency's personnel department, appears more reliable as evidence of Ms. Wilson's prior CIA affiliation than the sort of "public speculation" generally dismissed in the case law. Afshar v. Dep't of State, 702 F.2d at 1131. Nevertheless, a bureaucratic transmittal from the CIA's personnel department to a former employee is hardly akin to the CIA director personally reading relevant information into the Congressional Record, as took place in Wolf v. CIA, 473 F.3d at 379. The distinction is not only that the latter act constituted an "official disclosure," see id., but also that anything short of such a disclosure necessarily preserves some increment of doubt regarding the reliability of the publicly available information.[26] The CIA's refusal to permit the elimination of that remaining doubt with respect to Ms. Wilson's pre-2002 service itself protects valuable information, namely, the accuracy of the facts stated in the February 10 Letter and whether there is anything left to hide on the subject. See Phillippi v. CIA, 655 F.2d 1325, 1331 (D.C. Cir. 1981) ("There may be much left to hide, and if there is not, that itself may be worth hiding."). We decline to discount the importance of such "lingering doubts" to maintaining the secrecy of CIA sources and methods relating

February 10 Letter, for which she is herself responsible.

[26] No different conclusion is warranted by Ms. Tumolo's unclassified declaration submitted in this litigation, which explains how the February 10 Letter was prepared but does not specifically address the accuracy of the information contained therein. Indeed, the declaration suggests that Ms. Tumolo had no personal knowledge of the facts stated in the Letter, but simply relied on staff, whose negligence in performing their duties, at least with respect to classification checks, is undisputed.

to unconfirmed periods of Ms. Wilson's Agency service,  Military Audit Project v. Casey, 656 F.2d 724, 745 (D.C. Cir. 1981), and to preserving the options of deniability and professed ignorance that remain important niceties of international relations, see Afshar v. Dep't of State, 702 F.2d at 1130-31; see also Snepp v. United States, 444 U.S. at 510 n.3 (recognizing government's "compelling interest in protecting . . . the appearance of confidentiality so essential to the effective operation of our foreign intelligence service").

Having determined that defendants could demonstrate that Ms. Wilson's dates of service should remain classified, the question remains, of course, whether they have done so here with the "specificity" necessary to confirm the rationality of their decision.  See McGehee v. Casey, 718 F.2d at 1149.  In short, does the Agency have good reason to conclude that full disclosure of Ms. Wilson's employment history "reasonably could be expected to result in damage to the national security"? Exec. Order 13,292, § 1.1(a)(4), 68 Fed. Reg. at 15,315-16.  We have reviewed  defendants' unclassified submissions as well as – without objection by the parties – the classified materials provided to the court ex parte, and we conclude, as the district court did, that defendants have met their burden.

Our discussion of the classified facts in this opinion is necessarily circumspect. Nevertheless, we conclude from these facts that plaintiffs' disclosure of the information presently censored by the CIA would do more than reveal dates of service.  It would facilitate the identification of particular intelligence sources and methods, thereby compromising the Agency's ability to use such sources and methods in the future.  That the CIA views these risks as real and substantial is demonstrated by the significant actions already taken by the

46

Agency and described in the classified submission. In sum, the CIA has advanced "good reason" to maintain any pre-2002 Agency service by Ms. Wilson as classified and to prevent the inclusion of such information in her memoir. McGehee v. Casey, 718 F.2d at 1149. The CIA having provided "rational and plausible" reasons for continued classification, id., our review obligations are satisfied, and we will not further second-guess Agency judgment, see John Doe, Inc. v. Mukasey, 549 F.3d at 875, 882.

Because we reject plaintiffs' argument that no good reason supports the CIA's maintenance of Ms. Wilson's pre-2002 dates of Agency service as classified, and because we have already determined that this information has not been officially disclosed by the CIA, we necessarily conclude that plaintiffs' First Amendment challenge to defendants' redactions to Fair Game fails as a matter of law. Ms. Wilson – like every other current and former Agency employee who has signed a Secrecy Agreement – "simply has no first amendment right to publish" the information here at issue, regardless of how "public" her past activities appear to have become. Stillman v. CIA, 319 F.3d at 548.

The fact that others, not subject to such a secrecy obligation, are free to investigate Ms. Wilson's past and to compile and discuss all available information regarding her career – including the February 10 Letter – is not, as plaintiffs insist, an absurd or anomalous result. The law has long distinguished between "strangers," who "may republish previously published material," and former intelligence agents, who "are bound by formal agreements not to disclose [classified] information." Alfred A. Knopf, Inc. v. Colby, 509 F.2d at 1370. As noted, when Ms. Wilson elected to serve with the CIA, she accepted a life-long restriction

47

on her ability to disclose classified and classifiable information. That Ms. Wilson's service may have been cut short by the failure of others to respect the classified status of her employment may well have warranted investigation. But these circumstances do not absolve Ms. Wilson of her own secrecy obligations.

## III. Conclusion

To summarize, because any pre-2002 dates of service by Valerie Plame Wilson with the CIA have not been officially disclosed by the Agency and remain properly classified, and because Ms. Wilson is obligated by a Secrecy Agreement with the CIA not to disclose classified information, neither Ms. Wilson nor the publisher of her memoir can assert a First Amendment right to publish that information. Accordingly, the district court's award of summary judgment in favor of defendants is AFFIRMED.

KATZMANN, Circuit Judge, concurring in the judgment:

I agree with the majority that Ms. Wilson's pre-2002 dates of service, if any, were originally properly classified by the CIA, have never been officially declassified, and were never officially disclosed by the CIA. Therefore, I also agree that this Court has no power to free Ms. Wilson from the secrecy agreement that she signed upon commencement of her employment with the CIA. At the same time, I write to observe that the CIA's position in this litigation blinks reality in light of the unique facts of this case and the policies behind the doctrines at issue here. Indeed, the CIA's litigation posture may very well be counterproductive to its purposes.

If the February 10, 2006 letter on CIA letterhead had not surfaced in the Congressional Record ("February 10 Letter"), and we were merely faced with the question of whether Ms. Wilson should be permitted to disclose her possible pre-2002 service dates, despite the fact that they were already the subject of widespread media reports, the answer would clearly be no. The same would be true if the question was, even given the publication of the February 10 Letter, whether the CIA should be forced to officially acknowledge any of Ms. Wilson's possible pre-2002 dates of service. However, that is not this case.

As it appeared in the Congressional Record, the February 10 Letter stated the following:

> Dear Mrs. Wilson, This letter is in response to your recent telephone conversation with regarding [sic] when you would be eligible to receive your deferred annuity. Per federal statute, employees . . . who have acquired a minimum of 20 years of service, are eligible to receive their deferred annuity at their Minimum Retirement Age. . . .
>
> . . . .

49

Following is a list of your federal service:

Dates of Service: CIA . . . from 11/9/1985 to 1/9/2006 — total 20 years, 7 days.

. . . .

Please let me know if I can be of any further assistance.

153 Cong. Rec. E119 (daily ed. Jan. 16, 2007).

Further, in connection to this litigation, Karen F. Tumolo submitted an unclassified, public declaration attesting to the fact that she signed the February 10 Letter to Valerie Wilson; at the time she signed the letter she was the Chief of Retirement and Insurance Services at the CIA, responsible for managing the CIA's retirement and insurance benefits programs; and, in the ordinary course, in responding to a request such as Ms. Wilson's for information on retirement annuity eligibility, her office would verify that the employee's status was not classified. However, her declaration further stated, acknowledging the agency's negligence, that "[t]he employees in my office neglected to perform such a classification review of Ms. Wilson's personnel file. As a consequence, the summary of Ms. Wilson's service was not properly marked to indicate that the information was classified." *See* Declaration of Karen F. Tumolo, Senior Benefits Specialist, Office of Personnel Resources, Directorate of Support, Central Intelligence Agency ¶ 9.

Relevant case law, developed largely in the context of the Freedom of Information Act, has focused on the harm that could come to national security from an *official CIA disclosure* of information that has already entered the public domain. Three general concerns have been identified: (1) the benefits that come to the CIA from plausible deniability;[1] (2) the possibility of

---

[1] *See, e.g.*, *Military Audit Project v. Casey*, 656 F.2d 724, 744-45 (D.C. Cir. 1981) ("[T]he government argues it still has something to hide; the reported purpose of the Glomar Explorer's mission may well be notorious, but . . . its actual purpose may well still be a secret, or, at the very least, unresolved doubt may still remain in the minds of the United States' potential and actual

foreign retaliation;[2] and (3) the effect on the CIA's intelligence-gathering capabilities, both in terms

of intelligence sources and intelligence methods.[3]

---

adversaries as to the true purpose of the mission. . . . [E]ven if the true purpose of the mission was in fact to raise a submarine from the floor of the ocean, there may be some advantage in leaving the Soviet intelligence agencies with lingering doubts whether some other purpose motivated the project. Whatever the truth may be, it remains either unrevealed or unconfirmed. We cannot assume . . . that the CIA has nothing left to hide. To the contrary, the record before us suggests either that the CIA still has something to hide or that it wishes to hide from our adversaries the fact that it has nothing to hide.") (footnote omitted).

[2] *See, e.g.*, *Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981) ("[Former Soviet leader Nikita] Khrushchev stated in his Memoirs that what led him to cancel the Paris Summit meeting with President Eisenhower after the U-2 incident [in 1960] was not the fact that American U-2's had overflown the Soviet Union[--] that was not news to Khrushchev[--] but rather that President Eisenhower had publicly admitted that he had approved the mission . . . . In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation of the purpose of the Glomar Explorer project . . . could have an adverse effect on our relations with the Soviets."); *Earth Pledge Found. v. CIA*, 988 F. Supp. 623, 628 (S.D.N.Y. 1996) (official confirmation of a CIA field station in the Dominican Republic could cause a confrontation with the Dominican Republic or the disruption of foreign relations, despite disclosure of the station's existence in a Senate Report, because "countries are willing to tolerate the presence of CIA installations in their country only if the United States does not officially acknowledge that such stations exist. Thus, confirmation of the existence of such an installation, even by another branch of the federal government, is different from the CIA itself acknowledging the existence of the base.") (citation omitted).

[3] *See, e.g.*, *Military Audit*, 656 F.2d at 739-40 ("The disclosure of the names of organizations and their employees who entered into . . . confidential agreements with the CIA, in connection with the [Glomar Explorer] Project, would almost certainly impact negatively on the ability of the CIA to obtain the assistance of such entities and individuals in similar ventures in the future. . . . A disclosure that these entities had been engaged with the CIA in an intelligence operation could be harmful to their foreign business and possibly affect the safety of those of their employees who travel abroad. . . . If the CIA cannot be counted upon to keep the identity of its contractors secret when it has given assurances it will do so, potential contractors may either demand higher fees or refuse to do business with the CIA altogether. . . . [I]t is one thing for a company to assume the risks of unavoidable or inadvertent leaks and quite another to assume the risk that . . . the CIA [will] reveal the link between the company and the Agency.") (internal quotation marks omitted); *Wolf v. CIA*, 473 F.3d 370, 376 (D.C. Cir. 2007) (official confirmation of a human intelligence source's cooperation with the CIA could "cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends," and would "seriously damage this nation's credibility with all other current intelligence sources and undermine CIA's ability to attract potential intelligence sources in the future") (internal quotation marks omitted).

The CIA and the majority rely on all three of these concerns in this case. The majority discusses plausible deniability,[4] and CIA Deputy Director Stephen R. Kappes convincingly explains, both in his classified and unclassified declarations, what harm will come to national security, in terms of foreign retaliation and the effect on the CIA's intelligence-gathering capabilities, if Ms. Wilson's pre-2002 service dates, if any, are *officially acknowledged* by the CIA.[5]   Mr.

[4] According to the majority

anything short of [the CIA director personally reading relevant information into the *Congressional Record*] necessarily preserves some increment of doubt regarding the reliability of the publicly available information. The CIA's refusal to permit the elimination of that remaining doubt with respect to Ms. Wilson's pre-2002 service itself protects valuable information, namely, the accuracy of the facts stated in the February 10 Letter and whether there is anything left to hide on the subject. We decline to discount the importance of such "lingering doubts" to maintaining the secrecy of CIA sources and methods relating to unconfirmed periods of Ms. Wilson's Agency service, and to preserving the options of deniability and professed ignorance that remain important niceties of international relations.

Majority Op. at [ ] (citations and footnote omitted).

[5]     For instance, according to Mr. Kappes, human intelligence sources who furnish information to the CIA will do so only if they are confident that the CIA will do everything in its power to ensure that their cooperation will remain forever secret.   Therefore, official acknowledgment of an individual source's cooperation with the CIA would seriously damage the CIA's credibility with all of its other sources, and undermine its ability to attract intelligence sources in the future. "The CIA must show its intelligence sources that, even if information that may or may not be true has been disclosed, the CIA will stand by a policy to not acknowledge intelligence information, if any, in order to preserve commitments that the CIA has made to its sources, and to try to preserve those sources' trust in the CIA." Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency ("Kappes Decl.") ¶ 36.

For example, if an unauthorized disclosure of classified CIA information regarding a human intelligence source were made, that disclosure could jeopardize the source. If the CIA were to officially acknowledge the information, however, that additional step could further jeopardize the source and could deter other clandestine human intelligence sources from cooperating with the CIA. Existing and future human intelligence sources would note that the CIA was willing to confirm publicly a clandestine human intelligence source's involvement with the CIA. These human sources would factor that additional risk into their own decision on whether to provide information to the CIA and could decide that the risks are too great to cooperate with the CIA.

Kappes Decl. ¶ 68. The same applies to "foreign liaison relationships," or cooperative, secret relationships between the CIA and foreign government entities.

[F]oreign liason sources can be expected to cooperate with the CIA only as long as they remain assured that the CIA will do everything within its power to protect the fact, nature, and details of the clandestine intelligence relationship. . . . If the CIA breaches that confidence and trust, the foreign liaison service can terminate the intelligence relationship,

Kappes' reasons are detailed, rational, and plausible on their face; indeed they are compelling. *See, e.g.*, *McGehee v. Casey*, 718 F.2d 1137, 1148-49 (D.C. Cir. 1983).

However, Ms. Wilson is *not* asking the CIA to officially acknowledge her possible pre-2002 dates of service. The purpose of Mr. Kappes' classified and unclassified declarations was to describe the harm to national security that would result from the CIA *officially acknowledging* the information contained in the February 10 Letter. *See* Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency ("Kappes Decl.") ¶ 3 ("The purpose of this declaration is to describe . . . the serious damage to the national security that reasonably could be expected to result if certain information in the 10 February 2006 letter is officially acknowledged by the CIA."); Classified In Camera, Ex Parte Declaration of Stephen R. Kappes, Deputy Director, Central Intelligence Agency, Secret, dated July 18, 2007, ¶ 3 (unclassified paragraph) ("The purpose of this

---

or retaliate in any number of ways . . . .
Id. ¶ 44-45.

In addition, CIA intelligence-gathering methods are useful only so long as they remain unknown and unsuspected. Once a method is discovered, "its continued successful use will be in serious jeopardy." *Id.* ¶ 48. Therefore, "[a]cknowledging cover mechanisms used by the CIA would expose and officially confirm those mechanisms, hindering the effectiveness of the cover for current and future covert employees, as well as current and future intelligence operations." *Id.* ¶ 58.

As for foreign retaliation, Mr. Kappes declares that an official disclosure by the CIA could lead a foreign government, either friend or foe, to retaliate against the United States. For example, the CIA maintains covert installations abroad, and "[o]fficial acknowledgment that the CIA maintains an installation in a particular location abroad would likely cause the government of the country in which the installation is located to take countermeasures." *Id.* ¶ 59. The same would be true if the CIA were to acknowledge that a foreign country was the target or location of its intelligence operations.

According to Mr. Kappes, this serious damage to national security could result even if the CIA officially acknowledged information that had already been reported in the media. For example, in terms of foreign liaison relationships:

> Foreign governments would learn of the official acknowledgment and conclude that the CIA is not trustworthy enough to prevent acknowledgment of sensitive information that is reported in the media. A foreign liason partner could view the acknowledgment as a direct violation of their agreement with the CIA to keep their liaison activities secret. Countries could be expected to respond based on their perception of the CIA's inability to honor its commitments.

*Id.* ¶ 70.

declaration is to describe . . . the classified information that would be revealed if the CIA acknowledged whether Ms. Wilson was employed by the CIA prior to 1 January 2002. I also describe in greater detail the serious damage to the national security that reasonably could be expected to result if the CIA acknowledges the classified information in the 10 February 2006 letter."). Yet the declarations do not address why publication of Ms. Wilson's memoir would be an official acknowledgment by the CIA.

Moreover, despite the publication of the February 10 Letter on CIA letterhead in the Congressional Record, the declarations make no effort to explain how the harms described would be likely to result from the publication of Ms. Wilson's book, instead of, or in addition to, the publication of the February 10 Letter itself. Instead, the declarations ignore the February 10 Letter entirely. While it is inherently plausible that a foreign government could learn of an official CIA acknowledgment and conclude that the CIA is not trustworthy, thereby causing harm to our national security, *see* Kappes Decl. ¶ 70, it is not inherently plausible that a foreign government would consider Ms. Wilson's book, rather than the February 10 Letter coupled with Ms. Tumolo's public declaration submitted in connection with this case, to be an official acknowledgment by the CIA. Indeed, courts agree that books published by former CIA agents are not official CIA disclosures. *See, e.g.*, *Afshar v. Dep't of State*, 702 F.2d 1125, 1133-34 (D.C. Cir. 1983) ("Plaintiff points first to a number of books by former CIA agents and officials, all of which were submitted to the agency for prepublication review . . . . [N]one of the books is an official and documented disclosure, as the release of CIA cables would be."). Yet the CIA ignores this issue, and, in doing so, assumes away a crucial component in this case.

Finally, if there is "some increment of doubt" regarding the reliability of the February 10 Letter, despite the fact that the CIA submitted a sworn, unclassified, public declaration from the

letter's author stating that the letter had been prepared in the ordinary course of business but was inadvertently not subjected to the normal classification review, it is unclear why the publication of Ms. Wilson's personal memoir would somehow erase that doubt and authoritatively establish the accuracy of the facts contained in the letter. If anything, Ms. Tumolo, and not Ms. Wilson, is the "official of the United States in a position to know of what [s]he spoke." *See Alfred A. Knopf, Inc. v. Colby*, 509 F.2d at 1362, 1370 (4th Cir. 1975) ("It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so. The reading public is accustomed to treating reports from uncertain sources as being of uncertain reliability, but it would not be inclined to discredit reports of sensitive information revealed by an official of the United States in a position to know of what he spoke.").

Indeed, the CIA's position in this litigation, set forth in unclassified, publicly filed court documents, has served only to give credence to the perception that the February 10 Letter accurately set forth Ms. Wilson's dates of service. Senator Daniel Patrick Moynihan, a student of secrecy, believed that the obvious need to protect legitimate secrets is undermined when agencies proceed reflexively without a fully reasoned assessment of the likely consequences of positions contemplated. *See* Daniel Patrick Moynihan, *Secrecy*, with a new preface by the author (1998). This may have been such a case.