**AMERICAN CIVIL LIBERTIES UNION and American Civil Liberties Union Foundation, Plaintiffs,**

v.

**DEPARTMENT OF DEFENSE, Central Intelligence Agency, Department of State, and Department of Justice, Defendants.**

**No. 09 Civ. 8071(BSJ)(FM).**

United States District Court, S.D. New York.

Oct. 25, 2010.

Arthur Nelson Eisenberg, Christopher T. Dunn, Hina Shamsi, Melissa Goodman, Jonathan Matthew Manes, American Civil Liberties Union Foundation Jonathan L. Hafetz, New York, NY, for Plaintiffs.

Jean–David Barnea, Brian K. Morgan, U.S. Attorney's Office, New York, NY, for Defendants.

### *Memorandum and Order*

BARBARA S. JONES, District Judge.

This case involves requests for documents, under the Freedom of Information Act, regarding the detention of prisoners at the Bagram Theater Internment Facility at the Bagram Airfield in Afghanistan. Each set of parties submitted a motion for partial summary judgment regarding whether the Central Intelligence Agency improperly refused to process Plaintiffs'

request and whether the Department of Defense is improperly withholding facts related to Plaintiffs' request. For the reasons provided below, Plaintiffs' motion for partial summary judgment is DENIED and Defendants' motion for partial summary judgment is GRANTED.

## BACKGROUND

In April 2009, Plaintiffs submitted identical Freedom of Information Act ("FOIA") requests to the Department of Defense ("Defense"), the Central Intelligence Agency ("CIA"), the Department of Justice ("Justice"), and the Department of State ("State"). (Hilton Decl. Ex. A.) Plaintiffs seek documents pertaining to the detention and treatment of prisoners at the Bagram Internment Facility ("Bagram") in Afghanistan. The requested information includes, among other things: (1) the number of detainees at Bagram; (2) the names of the detainees; (3) the citizenship of the detainees; (4) dates of capture and length of detention; (5) places and circumstances of capture; (6) any transfer of the detainees from outside of Afghanistan to Bagram; (7) any agreements with the government of Afghanistan relating to the detainees' detention; (8) the process for reviewing the appropriateness of the detainees' detention; (9) potential transfer to the custody of Afghanistan; and (10) the condition of the detainees' confinement. (*Id.* at 4–6.)

In May 2009, the CIA denied Plaintiffs' request pursuant to FOIA Exemptions 1 and 3.[1] (*Id.* Ex. B.) The CIA explained that it could neither confirm nor deny the existence or nonexistence of records responsive to Plaintiffs' request because "[t]he fact of the existence or nonexistence of [the] requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by" the Central Intelligence Agency Act. (*Id.*) This is known as a *Glomar* response. *See Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C.Cir. 1976).

In July 2009, Defense identified a document responsive to the first five categories of Plaintiffs' request, but withheld the document in its entirety. (Barnea Decl. Ex. A.) Defense subsequently released a redacted version of the document in January 2010. (Barnea Decl. Ex. C.) The redacted version shows the names and partial Internee Serial Numbers ("ISNs") for the detainees. (*Id.*) The document also contains column headings for citizenship, dates of capture, amount of time detained at Bagram, locations of capture, circumstances of capture, and complete ISNs. (*Id.*) The information beneath these column headings is redacted, however. (*Id.*) Defense informed Plaintiffs that the redacted information was being withheld because it is exempt from disclosure pursuant to FOIA Exemptions 1 and 2.[2] (Hood Decl.; *see also* Bragg Decl.)

In September 2009, Plaintiffs filed the instant action, seeking an injunction compelling the CIA and Defense, among others, to process their FOIA requests and to release responsive records.[3] (Compl. ¶ 4.)

## LEGAL STANDARD

When presented with a FOIA request, the agency "must disclose its records 'unless its documents fall within one of the specific, enumerated exemptions set forth in'" FOIA. *See Associated Press v.*

---

1. *See* 5 U.S.C. § 552(b)(1), (3) ("Exemption 1" and "Exemption 3").

2. *See* 5 U.S.C. § 552(b)(1), (2) ("Exemption 1" and "Exemption 2").

3. Plaintiffs also administratively appealed both agency decisions. (Barnea Decl. Ex. B; *see also* Hilton Decl. Ex. C.) Neither appeal was decided before Plaintiffs commenced this action, however.

*Dep't of Def.,* 554 F.3d 274, 283 (2d Cir. 2009) (citation omitted). In light of " 'the strong presumption in favor of disclosure,' " the agency bears the " 'burden . . . to justify the withholding of any requested documents.' " *See id.* (citation omitted). At summary judgment, "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney v. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir. 1994) (citations omitted). Declarations submitted by the agency are " 'accorded a presumption of good faith.' " *See id.* (citation omitted).

 Summary judgment is proper where the agency's " 'affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.' " *See Wilner v. Nat'l Sec. Agency,* 592 F.3d 60, 73 (2d Cir.2009) (citation omitted). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State,* 565 F.3d 857, 864 (D.C.Cir.2009) (citation omitted). " 'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.' " *Wilner,* 592 F.3d at 73 (citation omitted).

## ANALYSIS

### I. The CIA Properly Invoked the Glomar Doctrine

 In *Wilner,* the Second Circuit explained that an agency may properly invoke the *Glomar* doctrine and " 'refuse to confirm or deny the existence of certain records . . . if [a] FOIA exemption would itself preclude the acknowledgement of such documents.' " 592 F.3d at 68 (citations omitted). The agency " 'resisting disclosure' of the requested records 'has the burden of proving the applicability of an exemption.' " *Id.* (citation omitted). An agency may satisfy " 'its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions.' " *Id.* (citation omitted). In assessing a *Glomar* response, "a court must accord 'substantial weight' to the agency's affidavits, 'provided [that] the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of . . . bad faith.' " *Id.* (alterations in original) (citation omitted).

### A. Exemption 1 Justifies the CIA's Decision Not to Confirm or Deny the Existence or Nonexistence of Responsive Records

Exemption 1 protects records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to [an] Executive order." 5 U.S.C. § 552(b)(1). Executive Order 13,526 provides that, in response to a FOIA request, "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Exec. Order No. 13,526, § 3.6(a) (Dec. 29, 2009). The fact of the existence or nonexistence of the requested records was classified under Executive Order 12,958, as amended by Executive Order 13,292, which was superseded by Executive Order 13,526 in June 2010. (*See* Hilton Decl. ¶ 2 n. 3.) Pursuant to Section 1.1 of Executive Order 12,958, "[i]nformation may be originally classified . . . only if all of the following conditions

are met: (1) an original classification authority" classifies the information; "(2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within" at least one of the categories of information listed in Section 1.4 of this order; and "(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to . . . national security . . . and the original classification authority is able to identify or describe the damage." Exec. Order 12,958, § 1.1(a)(1)-(4) (Apr. 17, 1995) (as amended by Exec. Order 13,292 (Mar. 25, 2003)).

Here, the parties dispute the last two requirements. With respect to the first two requirements, first, in support of their motion for partial summary judgment, the CIA submitted two declarations from Wendy M. Hilton, the Information Review Officer for detainee-related matters in the CIA. (Hilton Decl. ¶ 1.) Hilton, who holds "original classification authority at the TOP SECRET level," "determined that the CIA can neither confirm nor deny the existence or nonexistence of the requested records." (*Id.* ¶¶ 2, 3, 28, 29.) With respect to the second requirement, Hilton's declaration states that the information "is owned by and under the control of the United States Government." (*Id.* ¶ 29.)

■ Before addressing the merits of the last two requirements, the Court notes that Plaintiffs withdrew all but two of their document requests for the CIA in their motion for partial summary judgment. Plaintiffs now only seek records regarding the rendition or transfer of detainees to Bagram (Request No. 6) and the interrogation and treatment of detainees (Request No. 10) from the CIA.

With respect to the third requirement, in her declaration, Hilton explains that she "determined that the existence or nonexis-

tence of the requested records is a properly classified fact that concerns Sections 1.4(b) (foreign government information), (c) (intelligence activities and intelligence sources and methods), and (d) (foreign relations of the United States) (Hilton Decl. ¶ 29.)" *See* Exec. Order 12,958 § 1.4 (as amended by Exec. Order 13,292).

In regard to the fourth requirement, and Request No. 6 in particular, Hilton explains that acknowledging the existence or nonexistence of responsive documents would disclose at a minimum "whether or not the CIA was involved in the transfer of individuals from outside Afghanistan and . . . the CIA's association with or intelligence interest in the Bagram detainees or lack thereof." (Hilton Supp. Decl. ¶ 5.) Disclosure of documents responsive to this request would also "reveal information concerning the reach and limitations of the CIA's operations, particularly with respect to the capture and transfer of individuals detained at Bagram." (*Id.*) In addition, according to Hilton, "confirming the existence or non-existence of records pertaining to the transfer of individuals across international borders would risk disclosure of the CIA's liaison relationships (or lack thereof) and/or relationships with foreign government(s) (or lack thereof)." (*Id.* ¶ 6; *see also* Hilton Decl. ¶¶ 11–22, 31–48.)

With respect to Request No. 10, if the "CIA confirms the existence of the requested records," Hilton explains, "then, at the very least, it becomes known that the CIA has an intelligence interest in the Bagram detainees." (Hilton Supp. Decl. ¶ 7.) Conversely, should the CIA deny "it has records within the scope of the request, then it acknowledges a possible intelligence gap." (*Id.*) In the past, Hilton adds, groups hostile to the United States "have identified public disclosures similar to the disclosures sought by Plaintiffs in this case, and have adjusted their tactics

and/or operations accordingly." (*Id.*) In addition, "it is not just the disclosure of intelligence sources and methods as a general matter that the CIA seeks to prevent," according to Hilton, "but also the use and/or application of those sources and methods as applied in particular circumstances." (*Id.* ¶ 8; *see also* Hilton Decl. ¶ 11–22, 31–48.)

Plaintiffs reject the CIA's explanation. First, Plaintiffs accuse the CIA of failing to process their request. According to Plaintiffs, "merely processing" their request, which Plaintiffs seemingly equate with acknowledging whether or not the CIA has responsive documents, would not reveal secret intelligence methods, tools, activities, the location of secret CIA activity, or secret CIA sources or targets.

Plaintiffs' emphasis on "processing" their request is misplaced, however. Executive Order 13,526 and its predecessor, Executive Order 12,958, provide the specific procedure that must be followed when an agency invokes the *Glomar* doctrine in response to a FOIA request. Section 3.6(a) of Executive Order 13,526 provides that when the fact of the existence or nonexistence of requested records "is itself classified under this order or its predecessors," the "agency may refuse to confirm or deny the existence or nonexistence of requested records." In situations such as this, where the agency has determined that the requested records are classified under the terms of Executive Order 12,-958, the responding agency may simply "refuse to confirm or deny the existence or nonexistence of requested records." Exec. Order 13,526, § 3.6(a). Thus, to the extent Plaintiffs suggest that the CIA needs to acknowledge the existence or nonexistence of responsive documents in order to "process" their request, Plaintiffs are wrong.

Second and specifically to the merits of the CIA's classification, the crux of Plaintiffs' argument is that the CIA's classifica-

tion and determination of the harm that may result from acknowledging the existence of responsive records "is contradicted by volumes of contrary evidence that show that the CIA's rendition or transfer of suspected terrorists to U.S. military custody at Bagram, and its interrogation of prisoners there, is publicly-acknowledged and well-known." In *Wilner*, the Second Circuit explained that public awareness is not the test, however, for determining whether an agency has forfeited the right to provide a *Glomar* response. Instead, an agency "loses its ability to provide a *Glomar* response" only "when the existence or nonexistence of the *particular* records covered by the *Glomar* response has been officially and publicly disclosed." 592 F.3d at 70 (emphasis added).

"A strict test applies to claims of official disclosure." *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir.2009). In *Wilson*, the Second Circuit explained that "[c]lassified information that a party seeks to obtain . . . is deemed to have been officially disclosed only if it (1) '[is] as specific as the information previously disclosed,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.' " *Id.* (alterations in original) (citations omitted).

Here, Plaintiffs submit countless news accounts, statements from current and former government officials, and statements by other executive agencies regarding the CIA's alleged involvement in the rendition and transfer of detainees to Bagram (Request No. 6) and in the interrogation of the Bagram detainees (Request No. 10). In Hilton's supplemental declaration, however, she specifically represents that "no authorized United States Executive Branch official has officially acknowledged the CIA's association or lack thereof with the

'rendition and/or transfer,' detention and treatment of individuals held at Bagram." (Hilton Supp. Decl. ¶ 3; *see also* Hilton Decl. ¶ 11.) In addition, with respect to news accounts and statements by former government officials, members of Congress, and other executive agencies, in *Wilson,* the Second Circuit expressly explained that such statements do not constitute "official disclosures." *See* 586 F.3d at 186–87 ("the law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter; (2) statements made by a person not authorized to speak for the Agency; or (3) release of information by another agency, or even by Congress") (citations omitted).

While the statements Plaintiffs identify indicate that the CIA is involved in U.S. activities in Afghanistan, none of the statements specifically disclose the existence or nonexistence of records pertaining to the rendition or transfer of detainees to Bagram (Request No. 6) or the interrogation and treatment of detainees at Bagram (Request No. 10). *See Wolf v. C.I.A.,* 473 F.3d 370, 378 (D.C.Cir.2007) ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure. The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'") (emphasis in original) (citations omitted); *see also Wilner,* 592 F.3d at 70 ("An agency is ... precluded from making a *Glomar* response if the existence or nonexistence of the *specific* records sought by the FOIA request has been the subject of an official public acknowledgment. If the government has admitted that a specific record exists, a government agency may not later refuse to disclose whether that same record exists or not.") (emphasis added) (citations omitted).

Plaintiffs also highlight the public nature of the CIA's involvement in U.S. activities in Afghanistan in an effort to discredit the CIA's explanation regarding the harm that may result to national security from acknowledging the existence or nonexistence of responsive records. "[E]ven if a fact ... is the subject of widespread media and public speculation," however, "its official acknowledgment by an authoritative source might well be new information that could cause damage to the national security." *See Afshar v. Dep't of State,* 702 F.2d 1125, 1130 (D.C.Cir.1983). Here, Hilton's declarations explain that "official acknowledgment," which would "be new information," may result in the following damage to national security:

- "CIA's official acknowledgment of records for detainees severely undermines the intelligence value of those individuals" because "[a]l-Qaida will assume that [the] CIA has interviewed the detainee, and that he or she is compromised; as a result, al-Qaida may alter existing operations as a countermeasure or deduce the likelihood of exposure for non-detained associates;" (Hilton Decl. ¶ 17)

- If the CIA acknowledges it "has no correspondence with the Afghan government regarding the detainees, terrorist organizations, like al-Qaida, could infer a gap in the intelligence activities of [the] CIA, the Afghan government, or both. A terrorist organization would likely exploit this gap to the detriment of the U.S. and Afghan governments, and the intelligence activities, sources and methods of [the] CIA;" (*id.* ¶ 20)

- "An acknowledgment of the requested records could be expected to disrupt ongoing and/or future intelligence activities. For example, any response other than a Glomar response neces-

sarily would reveal classified information regarding where [the] CIA does and does not operate, and against whom. An acknowledgment would also reveal information regarding the nature of [the] CIA's cooperation with foreign governments, or the absence thereof. The disclosure of such information could endanger a foreign government's past or present leadership. And so, whether [the] CIA's response shows it engaged in intelligence activities alone or in conjunction with a foreign government, any response other than a Glomar response reasonably could be expected to prompt a foreign government to restrict current or future intelligence activities in an area of operation;" (*id.* ¶ 32)

- "Because terrorist organizations and foreign intelligence services view discovery of CIA methodology as one of their primary defensive missions, anything other than a Glomar response in this matter—where Plaintiffs seek 'all records' pertaining to individuals detained at Bagram and related correspondence between the U.S. and Afghan governments—would be of great benefit, by enabling terrorist organizations to redirect their limited resources to identify potential CIA methods or circumvent [the] CIA's monitoring efforts. As a result, [the] CIA's intelligence efforts could be thwarted or made more difficult, reducing the CIA's effectiveness, requiring a diversion of CIA resources, and resulting in a loss of valuable intelligence information;" (*id.* ¶ 37)

- "[A]cknowleding the existence or non-existence of Category Six records necessarily would disclose at minimum (i) whether or not the CIA was involved in the transfer of individuals from outside Afghanistan and (ii) the CIA's association with or intelligence interest in the Bagram detainees or lack there-

of. Disclosure of whether the CIA was involved or not in these specific intelligence activities would reveal information concerning the reach and limitations of the CIA's operations, particularly with respect to the capture and transfer of individuals detained at Bagram;" (Hilton Supp. Decl. ¶ 5.)

- If the "CIA confirms the existence" of documents responsive to Request No. 10, "then, at the very least, it becomes known that [the] CIA has an intelligence interest in the Bagram detainees. Conversely, if [the] CIA denies that it has records within the scope of the request, then it acknowledges a possible intelligence gap. In the past, foreign intelligence services and hostile groups, like al-Qaida, have identified public disclosures similar to the disclosures sought by Plaintiffs in this case, and have adjusted their tactics and/or operations accordingly." (*Id.* ¶ 7.)

Although Plaintiffs may disagree with the CIA's assessment of the potential harm to national security based on public awareness of the CIA's activities in Afghanistan, Plaintiffs have not presented contrary evidence that controverts the CIA's justification for providing a *Glomar* response. In light of Hilton's thorough declarations, which are filled with detailed examples, the Court finds that the CIA met its " 'burden of proving the applicability' " of Exemption 1. *See Wilner,* 592 F.3d at 68 (citation omitted).

Because Exemption 1 justifies the CIA's decision to provide a *Glomar* response, the Court need not consider the applicability of Exemption 3. *See id.* at 72 ("Because defendants need only proffer one legitimate basis for invoking the *Glomar* response and FOIA Exemptions 1 and 3 are separate and independent grounds in sup-

port of a *Glomar* response, we consider only the applicability of FOIA Exemption 3.") (citation omitted).

## II. Defense Properly Withheld the Redacted Portions of the Detainee List

In their reply brief, Plaintiffs indicate that they no longer challenge Defense's withholding of the full ISNs for the detainees. Accordingly, the only remaining issues are whether Defense properly withheld information regarding the detainees' citizenships, dates of capture, length of detention at Bagram, locations of capture, and circumstances of capture.

■ Defense contends that these categories of information are properly being withheld under Exemption 1 because the information is classified pursuant to Executive Order 12,958, as amended by Executive Order 13,292, the predecessor to Executive Order 13,526. As explained earlier, information is properly classified pursuant to Executive Order 12,958 where: "(1) an original classification authority" classifies the information; "(2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within" at least one of the categories of information listed in Section 1.4 of the Order; and "(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to ... national security ... and the original classification authority is able to identify or describe the damage." Exec. Order 12,958, § 1.1(a)(1)-(4) (as amended by Exec. Order 13,292).

In support of its decision to withhold the requested categories of information, Defense submitted a declaration by Major General Jay W. Hood, the Chief of Staff for U.S. Central Command for Defense and an Original Classification Authority pursuant to Executive Order 12,958.

(Hood Decl. ¶¶ 1, 3.) Major General Hood explains, first, that the five categories of information sought by Plaintiffs are classified (*id.* ¶ 5, 6). Major General Hood also explains, second, that the document with the redacted information was produced from a Government-controlled database. (*Id.* ¶ 4; Bragg Decl. ¶¶ 2, 4.)

In response to Plaintiffs' objections that Major General Hood failed to adequately explain how each category of redacted information satisfies the third and fourth requirements for classification under Executive Order 12,958, Defense submitted a declaration by Major General Michael T. Flynn, the Director of Intelligence for the International Security Assistance Force and the United States Army Forces—Afghanistan. (Flynn Decl. ¶ 1.) With respect to the third requirement, Major General Flynn explains that: (1) information regarding the detainees' citizenship is covered by Section 1.4(a) ("military plans, weapons systems, or operations") and (c) ("intelligence activities (including special activities), intelligence sources or methods, or cryptology"); (2) information regarding capture dates is covered by Sections 1.4(a) and (c); (3) information regarding capture locations is covered by Sections 1.4(a), (c), and (g) ("vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services"); (4) information regarding circumstances of capture is covered by Sections 1.4(a), (c), and (g); and (5) information regarding lengths of detention is covered by Sections 1.4(a), (c), and (g) (*id.* ¶¶ 5-9; *see also* Hood Decl. ¶ 5). *See* Exec. Order 12,958, § 1.4(a),(c), and (g) (as amended by Exec. Order 13,292).

With respect to the fourth requirement, Major General Flynn identifies the following possible damage to national security from disclosure of each category of information:

- Citizenship—disclosure, when connected with other information, "could hinder future intelligence collection efforts by revealing sources, methodology, and ultimately levels of cooperation/opposition." Release of this information "could cause damage to future military plans, operations, and detainee operations" by helping enemies predict "the direction of . . . future military operations which may target areas heavy with [particular] citizenship demographic[s]." In addition, "the strategic implications of the citizenship of detainees could negatively influence diplomatic relations with other countries, in particular, the country or countries of which such detainees are citizens." (Flynn Decl. ¶ 5.)

- Capture Dates—release of this information "could assist [enemies] in establishing a chronological pattern or identifying operational strategies which could be used to assist them in hiding or evading future intelligence gathering efforts, and anticipating counterterrorism or counterinsurgency efforts." When combined with other information, disclosure of the detainees' capture dates "could provide organizations with insights into past and current strategies and tactics in military operations that lead to capture of the enemy." "[R]elease of this combined information could" also "provide material assistance to those who wish to penetrate, detect, prevent, avoid or otherwise damage the intelligence and detainee operations of the United States and might allow individuals of intelligence interest to anticipate and immunize themselves from such procedures." (Id. ¶ 6.)

- Capture Locations—release of this information "could cause damage to military plans, intelligence activities, intelligence sources, and intelligence methods and could create a life and physical safety risk for any U.S. personnel" that remain in the locations where detainees were captured. When combined with other information, release of capture locations "could allow the enemy to detect some of the United States' sources of intelligence that led to the capture of enemy combatants," which "would significantly dispute the United States' efforts in Afghanistan by revealing information about U.S. objectives, raid locations, base camp locations, cordon and search locations, traffic control points, and border crossing points." (Id. ¶ 7.)

- Circumstances of Capture—disclosure of this information, which "is perhaps the most sensitive category," "could cause damage to military plans, intelligence activities, intelligence sources, and intelligence methods" by allowing "the opposition to intuit military [standard operating procedures], the sources of intelligence, or other critical operational factors." When combined with other information, disclosure of this information "could reveal critical tactical information about detainee collection points, detainee holding areas, evacuation procedures, and the handling process that could place intelligence operations and detainee operations at jeopardy." (Id. ¶ 8.)

- Length of Detention—release of this information, when combined with other information, could help the enemy "develop patterns of detention periods" and, subsequently, "correlate this data with the [standard operating procedures] surrounding intelligence and detention operation." Disclosure of this information, in conjunction with other requested information, "could assist the enemy in understanding [the Government's] evidence gathering and prosecution strategy which could be

used to predict and exploit detention procedures." Ultimately, this could "lead to less quality intelligence" and "more robust estimative intelligence by the enemy." (*Id.* ¶ 9.)

In light of the declarations by Major General Hood and Major General Flynn, the Court is satisfied that Defense has sufficiently demonstrated that each withheld category of information logically falls within Exemption 1 and that Defense has sufficiently identified and described the possible damage to U.S. national security.[4] *See Wilner*, 592 F.3d at 73 (citations omitted).

In spite of the two Defense declarations and the fact that Defense released several less-redacted versions of the list sought by Plaintiffs, Plaintiffs maintain that Defense has not sufficiently shown that each withheld category of information (or combinations thereof) are properly classified in their entirety. Plaintiffs point to the Guantánamo Bay detainee hearings and the recently instituted Detainee Review Board ("DRB") hearings at the Detention Facility in Parwan, Afghanistan. According to Plaintiffs, transcripts of the hearings for the Guantánamo detainees regularly disclose information pertaining to citizenship, length of detention, date of capture, location of capture, and circumstances of capture. Similarly, at several unclassified, open DRB hearings, members of human rights organizations observed open discussion of certain Bagram detainees' places of origin, dates of capture, locations of capture, and circumstances of capture. (*See* Prasow Decl. ¶¶ 5–7.) Plaintiffs argue that Defense cannot treat as classified here what it treats as unclassified in DRBs and analogous Guantánamo detainee hearings.

First, with respect to the Guantánamo hearings, there is no allegation that the information sought here "match[es] the information previously disclosed." *See Wilson*, 586 F.3d at 186 (alteration in original) (citations omitted). There is no allegation, for example, that any of the requested information for the Bagram detainees was officially disclosed in a Guantánamo hearing for which there is a public transcript. Because there is no exactitude between the information previously disclosed and the information sought here, whatever information the Government has decided to release regarding the Guantánamo detainees has no bearing on Plaintiffs' requests in this case. *See, e.g., Wolf,* 473 F.3d at 378 (citations omitted).

With respect to the DRB hearings, because Plaintiffs did not raise this issue until after the Government filed its opposition and reply brief, the Court requested that the Government submit a sur-reply addressing the impact, if any, of the DRB hearings on Plaintiffs' requests. In response to the Court's request, Defense submitted a declaration by U.S. Navy Captain Gregory P. Belanger. Captain Belanger, who is currently assigned to the Office

---

4. The Court also credits Defense's argument that "an aggregate release" of the requested information "would create a mosaic of information" that "would greatly affect national security by giving the enemy a complete picture of [U.S.] military operations." (Flynn Decl. ¶ 11.) "[W]hen considered together," the requested information could, according to Major General Flynn, "reveal significant details of classified missions that, in turn, could place future mission operations in jeopardy" (*id.* ¶ 10) and endanger the lives of members of the armed forces (*id.* ¶ 11). *See, e.g., C.I.A. v. Sims,* 471 U.S. 159, 178, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (observing that "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context" and that "bits and pieces of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself'") (alteration in original) (citations omitted).

of the Staff Judge Advocate at Combined Joint Interagency Task Force ("CJIATF") 435 at Camp Phoenix in Afghanistan, was responsible for the administration of the DRB hearings, which involved Bagram detainees, at the Detention Facility in Parwan, Afghanistan. (Belanger Decl. ¶¶ 1–2.)

In his declaration, Captain Belanger explains that "each DRB hearing consists of an 'open' and a 'closed' session." (*Id.* ¶ 5.) During closed sessions, "classified information is presented only to the board members. All persons present at the closed session must have appropriate security clearance." (*Id.*) At open sessions, by contrast, "individual information that is generally unclassified—but is not necessarily so in the aggregate—is presented to the board in the presence of the detainee." (*Id.*) Only a narrow category "of people other than the detainee, witnesses, and military personnel" are permitted to attend "open" sessions. (*Id.* ¶ 6.) Each category of attendees must be granted access by the CJIATF Commander or a higher authority. (*Id.*) In addition, the "level of access of each" category of persons "is limited to a specific military purpose." (*Id.*)

One category of persons who have been granted access to open DRB hearings are "members of certain non-governmental organizations (NGOs)."[5] (*Id.*) To date, a total of ten representatives from five NGOs have observed nine open DRB hearings on two separate dates. (*Id.* ¶¶ 10, 12.) Of those nine hearings, only three, including the ones observed by Plaintiffs' declarant (*see* Prasow Decl.), involved detainees identified on the list sought by Plaintiffs.[6]

(*Id.* Ex. B.) On account of the information heard by NGO representatives and members of the media at those hearings, Defense supplied a revised detainee list that un-redacts the pertinent, previously redacted information. (*Id.* ¶ 22 & Ex. B.) The "release of th[is] detainee-specific information" was, according to Captain Belanger, "a limited and discretionary release of" information. (*Id.* ¶ 22.)

Numerous courts have found, under similar circumstances, that the Government's discretionary decision to release a limited set of information does not waive FOIA protection for similar information that is not discretionarily released. *See, e.g., Students Against Genocide v. Dep't of State,* 257 F.3d 828, 835–36 (D.C.Cir.2001) (noting that "by releasing some photographs to plaintiff, the government [did not] waive[ ] its right to withhold any others") (citation omitted); *Mobil Oil Corp. v. E.P.A.,* 879 F.2d 698, 701 (9th Cir.1989) (noting that courts "generally have found that the release of certain documents waives FOIA exemptions *only for those documents released* ") (emphasis in original) (citations omitted); *Ctr. for Biological Diversity v. Office of Mgmt. & Budget,* No. C 07–04997 MHP, 2009 WL 1246690, at *11 (N.D.Cal. May 5, 2009) (noting that " 'a waiver of exemption for these documents based on the release of related documents . . . would be contrary both to the case law on waiver and to the policies underlying FOIA and its exemptions' ") (citations omitted). Because Defense voluntarily released the previously redacted information that NGO and media representatives heard and because that discretionary disclosure does not constitute a waiver for the rest of the

5. The other three categories are: (1) detainee family members and relevant community leaders; (2) representatives of the government of Afghanistan with interest in a particular case; and (3) members of the news media. (Belanger Decl. ¶ 6.)

6. The list in question is limited to detainees who were detained as of June 22, 2009. (Barnea Decl. Ex. A.)

requested information under Exemption 1, the Court is satisfied that the DRB hearings have no further bearing on Plaintiffs' requests.

Beyond their Guantánamo and DRB arguments, Plaintiffs primarily attempt to poke holes in Defense's explanation regarding why the requested information is, and needs to remain, classified under Executive Order 12,958. Although Plaintiffs disagree with Defense's explanation, in light of the "substantial weight" accorded to agency affidavits, the Court will not conduct a detailed inquiry to determine whether it agrees with Defense's explanation. *See, e.g., Earth Pledge Found. v. C.I.A.,* 988 F.Supp. 623, 626 (S.D.N.Y.1996) (citations omitted). Accordingly, the Court declines Plaintiffs' request for in *camera* review of the complete, un-redacted list.

## CONCLUSION

For the reasons provided above, Plaintiffs' motion for partial summary judgment (Dkt. 20) is DENIED and Defendants' motion for partial summary judgment (Dkt. 11) is GRANTED.

If this Order does not resolve all of the outstanding issues in this case, the parties are directed to inform the Court of that fact by no later than November 1, 2010. Otherwise, the Court will issue an order instructing the Clerk of the Court to close this case on that date.

SO ORDERED.